**Volume 1 of 2**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

YITSCHAK EBERT, a/k/a Isaac, d/b/a

M&I Distributors, Incorporated,
a/k/a Isaac Ebert, a/k/a Issac Ebert,
a/k/a Yitzchok Ebert,
<u>Defendant-Appellant.</u>

No. 96-4871

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

MICHAEL KAZINEC, a/k/a Mike, d/b/a

M&I Distributors, Incorporated,
a/k/a Mike Kazinec, a/k/a Michael
Paul Kazinec,
<u>Defendant-Appellant.</u>

No. 96-4886

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

JOHN WAYNE FOSTER, JR., a/k/a
Wayne,
<u>Defendant-Appellant.</u>

No. 96-4887

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

BERNARD WILLIAM CRUSE, III, a/k/a
Bill, d/b/a The Food Outlet, a/k/a
Bill Cruse,
Defendant-Appellant.

No. 96-4888

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

MARK DAVID EIDELMAN, d/b/a

American Drug Wholesale, d/b/a
American International Wholesale
Drug,
Defendant-Appellant.

No. 96-4889

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

JOHN WAYNE FOSTER, SR., a/k/a
Johnny Foster,
Defendant-Appellant.

No. 96-4947

2

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

ROBERT WILLIAM SPITTEL, a/k/a Bob
Spittel, d/b/a North Bridge Salvage,
d/b/a Closeouts, Incorporated,
Defendant-Appellant.

No. 96-4948

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

STEVEN MICHAEL HALE, a/k/a Stevie
Michael Hale, a/k/a Steve Michael
Hale, d/b/a North Bridge Salvage,
Defendant-Appellant.

No. 96-4949

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

MARVIN JUNE PHILLIPS, a/k/a Jay;
BEST DEAL LIQUIDATORS,
INCORPORATED,
Defendants-Appellants.

No. 96-4975

3

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

No. 97-4016

BARRY GORDON YORK, d/b/a HBA
Liquidators,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CR-95-84-BR)

Argued: May 8, 1998

Decided: May 3, 1999

Before MURNAGHAN, NIEMEYER, and MICHAEL,
Circuit Judges.

_____

Affirmed in part, reversed in part, vacated in part, and remanded with
instructions by unpublished opinion. Judge Michael wrote the major-
ity opinion, in which Judge Murnaghan joined. Judge Niemeyer wrote
a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Carlos Marco Recio, Washington, D.C.; David W. Long,
POYNER & SPRUILL, L.L.P., Raleigh, North Carolina; Allen C.
Brotherton, KNOX, KNOX, FREEMAN & BROTHERTON, Char-
lotte, North Carolina; Daniel Smith Johnson, Winston-Salem, North
Carolina; David I. Schoen, Montgomery, Alabama, for Appellants.
Anne Margaret Hayes, Assistant United States Attorney, Raleigh,
North Carolina, for Appellee. **ON BRIEF:** Joseph E. Zeszotarski, Jr.,

4

POYNER & SPRUILL, L.L.P., Raleigh, North Carolina, for Appellant Eidelman; Valerie S. Amsterdam, New York, New York, for Appellant Kazinec. Lynn Broadway, Lawndale, North Carolina, for Appellant York. J. Douglas McCullough, STUBBS, PERDUE & AYERS, P.A., Raleigh, North Carolina, for Appellant Cruse; Nils Edward Gerber, Winston-Salem, North Carolina, for Appellant Spittel. Janice McKenzie Cole, United States Attorney, Banumathi Rangarajan, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

MICHAEL, Circuit Judge:

This case involves an alleged conspiracy to buy and sell stolen over-the-counter drugs (OTC), like aspirin, nasal spray and cough syrup, and health and beauty aids (HBA), like razor blades, shampoo, and toothpaste. The eleven defendants who appeal here -- Jay Phillips, Johnny Foster, Wayne Foster, Best Deal Liquidators, Inc., Barry York, Bill Cruse, Steve Hale, Bob Spittel, Mark Eidelman, Isaac Ebert, and Mike Kazinec -- were all convicted of conspiracy to transport or receive stolen goods. The defendants all operated businesses that bought and sold OTC and HBA. Each defendant bought some OTC and HBA from (or sold some OTC and HBA with) government informant Donald Thomas. Thomas, who held himself out as a supplier of salvaged and liquidated OTC and HBA, actually was a large-scale fence who bought stolen OTC and HBA from a number of shoplifters and smalltime fences. Thomas covered his tracks well though, and there was evidence that only four of the defendants, Ebert, Kazinec, Eidelman, and York, actually knew that his OTC and HBA was stolen. Thus, in addition to asserting that four defendants knew Thomas sold stolen merchandise, the government argued that all defendants deliberately closed their eyes to the true source of Thom-

5

as's OTC and HBA. Yet, the government did not offer any admissible direct evidence of deliberate ignorance, or even any individualized circumstantial evidence of deliberate ignorance. Rather, the government proceeded on the dubious theory that the defendants were deliberately ignorant to the true source of Thomas's OTC and HBA because Thomas's operation was "highly suspicious."

We conclude that the evidence at trial was legally insufficient to support the government's theory. The government did not show that Thomas's operation was highly suspicious, and even if it had, there was no proof that any of the defendants (except the four who had actual knowledge) had their own suspicions aroused. As a result, the convictions of Phillips, the Fosters, Best Deal, and Cruse cannot stand. Absent deliberate ignorance, there was simply no evidence that any of these defendants knew Thomas sold stolen OTC and HBA. We also reverse Hale and Spittel's convictions. Although there was evidence that Hale actually knew some of the OTC and HBA he sold was stolen and evidence that both Hale and Spittel consciously avoided viewing transactions in stolen OTC and HBA, this evidence should not have been admitted as substantive evidence of the charged conspiracy because the particular transactions in OTC and HBA were unrelated to Thomas's operation. We affirm the conspiracy convictions of Ebert, Kazinec, and Eidelman, and we affirm the money laundering and receiving stolen property convictions of Kazinec and Eidelman. The government presented testimony that these three defendants actually knew Thomas sold stolen OTC and HBA. We must, however, vacate Ebert's convictions for money laundering and receiving stolen property because North Carolina was an improper venue to try these charges.

In summary, we reverse the convictions of Phillips, the Fosters, Best Deal, Cruse, Hale, and Spittel, and we remand for the entry of judgments of acquittal as to them. We affirm the convictions of Kazinec and Eidelman on all charges, and we affirm Ebert's conspiracy conviction. We vacate Ebert's convictions for money laundering and receiving stolen property.[1] We remand for dismissal (for improper venue) of the money laundering and receiving stolen property charges

_____

[1] We have considered the other claims presented on appeal by Ebert, Kazinec, and Eidelman and find them to be without merit.

6

against Ebert and for his resentencing. York presents a special situation requiring a limited remand, and we take that up first.

## I. THE TIMING OF BARRY YORK'S NOTICE OF APPEAL

York filed his notice of appeal a few days late. To preserve the right to appeal, a criminal defendant must file a notice of appeal within 10 days after the entry of judgment. Fed. R. App. Proc. 4(b). However, upon a showing of excusable neglect, a district court may extend the time for filing by up to 30 days. Id. Judgment was entered against York on December 12, 1996, and he filed his notice of appeal on January 6, 1997. The 10-day deadline therefore had expired. However, because York filed the notice within 30 days of the expiration of the original appeal period, the district court had the discretion to grant an extension upon a showing of excusable neglect for the untimely filing. See United States v. Reyes, 759 F.2d 351, 353 (4th Cir. 1985). We therefore remand as to York to give him the opportunity to make such a showing before the district court.

## II. BACKGROUND

### A. The Alleged Conspiracy

Donald Thomas owned and operated a tool store, D&C Imports, in Garner, North Carolina. J.A. 1213. Thomas was considered a "trusted and reliable" member of his community. J.A. 1337. Colonel R. A. Barefoot, Commander of the North Carolina State Highway Patrol, was a close friend of Thomas's, and a frequent visitor to D&C Imports. J.A. 1061-65. Thomas even threw a party for Colonel Barefoot (which Jay Phillips and Wayne Foster attended) when he was promoted to lead the highway patrol. J.A. 1048B-48C; 1063-67. Thomas also was a friend of a former North Carolina Attorney General. J.A. 1061-64. Thomas was proud of his relationships with these state law enforcement officials and mentioned these relationships to some of his business associates, including Steve Hale. J.A. 1065. As a result of these relationships, Thomas was known about town as a "friend of law enforcement." J.A. 1064, 1066-67. Thomas cultivated this image with the part-time employment of a Raleigh police officer, Mark O'Shields, who helped operate D&C Imports. J.A. 180-81.

7

Thomas also regularly employed off-duty highway patrol officers to assist him with loading and unloading tools and other merchandise. J.A. 1048-1048A.

Thomas started out as a legitimate businessman, selling used tools at flea markets around North Carolina. He got started in the stolen property business in about 1986 by obtaining tools from shoplifters, whom he called "boosters," at a flea market in Fayetteville, North Carolina. J.A. 791-93, 1412-13. Thomas's wife and daughter helped him sell these stolen tools at various flea markets around North Carolina. J.A. 794. Thomas, however, was extremely secretive about the illegitimate source of his tools. Indeed, his daughter did not realize that she was selling stolen tools for the first three years she worked for him. J.A. 720-21. Despite his good relationship with the police, Thomas was constantly worried that he was being investigated. J.A. 1004-4B. Yet there was no evidence that any of Thomas's friends in law enforcement (except O'Shields, who was indicted along with the other defendants, J.A. 145) knew about Thomas's stolen property business.

After a short time Thomas was successful enough to open up his own tool store. J.A. 795. He continued to buy and sell tools at the flea markets, but he also began to buy other merchandise from the boosters he knew. The boosters began selling Thomas items like videos, batteries, electronic equipment, as well as name-brand OTC and HBA, like Tylenol. J.A. 802. After a time, Thomas asked these boosters to tell their friends that he would buy anything that they could steal, and soon his network grew to include 20 to 25 boosters. J.A. 792-95. The boosters often brought the stolen merchandise to Thomas at his home in Garner. J.A. 796-97.

In order to minimize booster traffic to his home, Thomas rented a trailer in Fayetteville and installed a fence, Curly Johnson, there to buy stolen goods from boosters on a full-time basis. J.A. 797-98. Curly Johnson bought a great deal of stolen name-brand OTC for Thomas. J.A. 802-05. Later, after his stolen OTC and HBA business was booming, Thomas also purchased stolen OTC and HBA from other, independent fences. J.A. 276, 796, 797, 800-02. Two such fences were Bob O'Neal, who operated tables at various flea markets around North Carolina, J.A. 1236-40, and Toby Johnson, who owned

8

a pawn shop in Durham, North Carolina. J.A. 1169. Thomas sold much of his stolen OTC and HBA to two local wholesalers. J.A. 802-04.

In 1992 Thomas met defendant Jay Phillips at a flea market in Lexington, North Carolina. Rec. Vol. 75, at 170. Phillips and a partner operated defendant Best Deal Liquidators, Inc. (Best Deal) in Sherrills Ford, North Carolina. J.A. 2146-51. Phillips told Thomas that he had heard that Thomas sold brand-name OTC and HBA and gave Thomas a list of OTC and HBA that he would like to buy. J.A. 803-05. Thomas soon started selling all of his OTC and HBA to Best Deal because Phillips promised to buy all the OTC and HBA that he (Thomas) could find, at a higher price than his former customers paid. J.A. 805. At first Phillips paid Thomas for the OTC and HBA in cash, J.A. 806, but soon he began paying Thomas by check, J.A. 810-11, 2725-28, 2730, 2763. At trial Thomas testified that he was just one of fourteen suppliers of Best Deal's OTC and HBA; Thomas could not say if the other suppliers sold Best Deal stolen goods. See Rec. Vol. 91, at 179 (citing Thomas's testimony). Thomas also said that he was diligent in not revealing his sources of stolen merchandise to his customers, because he feared that once his customers knew from whom he bought his goods, they would cut him out by buying the goods directly from his sources. J.A. 998-99, 1549.

After a while, the Fosters (defendants Wayne Foster and Johnny Foster) bought out Phillips's partner. J.A. 807-08, 1420-21, 2144. Wayne Foster helped Phillips with the day-to-day operation of Best Deal, J.A. 810, 820, 895-96, but Johnny Foster, an auto dealer and auctioneer in Lake Norman, North Carolina, was essentially a silent partner, Foster Supp. Br. 4. Johnny Foster did sell a number of automobiles to Thomas, for which Thomas paid mainly cash but also provided some tools and electronics equipment in partial payment. J.A. 283-84, 872-81. Although some of the merchandise Thomas exchanged for these cars was stolen, much of it was not, J.A. 854-55, 880, and there was no evidence that Johnny Foster knew any of it was stolen.

Thomas sold about $1 million worth of stolen OTC and HBA to Best Deal between August 1992 and November 1993. J.A. 277, 2723. During this time, Best Deal usually received shipments of OTC and

9

HBA from Thomas two times a week. J.A. 2725, 2763. Sometimes Phillips (or occasionally Wayne Foster or Johnny Foster, J.A. 810, 820, 1368-70) would pick up additional OTC and HBA from Thomas at D&C Imports or at flea markets. J.A. 808-09, 820. After Best Deal bought the stolen OTC and HBA from Thomas, the merchandise was "cleaned." The cleaning process involved the use of razor blades, cotton swabs, matches, and alcohol (or other solvents) to take all price stickers, security devices, and any other identification marks off the OTC and HBA. J.A. 502-03. After the OTC and HBA was cleaned and repackaged, Best Deal transported it to Brooklyn, New York, and sold it to various redistributors, including Joseph Parisi. J.A. 1419-26, 2735-39. Best Deal employed defendant Barry York, Johnny Foster's brother-in-law, J.A. 810, to help clean this merchandise and deliver it to New York. J.A. 834, 885-86, 1393-94. Thomas stopped doing business with Best Deal in October 1993 when he and Phillips fell out because Phillips paid Thomas only $60,000 for two loads of stolen OTC and HBA that Thomas valued at $80,000. J.A. 516-17, 825-30, Tr. Vol. 13 at 12-13.

Defendant Steve Hale operated North Bridge Salvage, Inc. (North Bridge) in Terrell, North Carolina. J.A. 277, 2152-55. Hale had originally planned to invest (with Phillips) in Best Deal in 1992, but the deal fell through. Hale then went into business for himself and hired his friend, defendant Bob Spittel. J.A. 830, 1442. At that time Hale contacted several of Phillips's sources of OTC and HBA, including Thomas, to offer higher prices if they would sell to North Bridge instead of to Best Deal. J.A. 747-55. Thomas declined to sell any OTC and HBA to Hale because he (Thomas) still had a good relationship with Phillips. J.A. 755. But when Thomas broke off his relationship with Best Deal, he called Steve Hale and offered to sell North Bridge all of his OTC and HBA. J.A. 830-31.

Thomas sold stolen OTC and HBA to North Bridge for just over a month, from late November 1993 to early January 1994. During that time Thomas sold approximately $320,000 worth of stolen OTC and HBA to North Bridge. J.A. 2158, 2728. North Bridge received deliveries of OTC and HBA from Thomas's operation twice weekly. Usually, Spittel met Thomas's wife in a parking lot or at the flea market in Lexington to pick up the OTC and HBA. J.A. 757-59. Sometimes, however, Spittel picked up the merchandise at D&C Imports. J.A.

10

760-61. North Bridge always paid for Thomas's OTC and HBA by check. J.A. 2778. Indeed, North Bridge functioned above board: it paid taxes, maintained detailed business records, was listed in the white pages, and even had an 800 number. J.A. 1590-91.[2] Indeed, during its one year of operation, North Bridge sold $6 million in OTC and HBA to wholesalers, only 5 percent of which came from Thomas. J.A. 2778, 2779-83; Hale Br. 9. The government offered no proof that all (or even a substantial portion) of North Bridge's sales involved stolen merchandise. Only two other sources of North Bridge's OTC and HBA, small-time fences Bob O'Neal and Toby Johnson, testified at trial, and the government offered no proof that these two fences accounted for more than a small fraction of North Bridge's business.

Like Curly Johnson, Thomas's fence in Fayetteville, both O'Neal and Toby Johnson bought OTC and HBA directly from boosters. J.A. 1176, 1180-81; Rec. Vol. 61, at 171, 177. However, unlike Curly Johnson, who was in business with Thomas, J.A. 485; Rec. Vol. 74, at 181, O'Neal and Toby Johnson did not operate on behalf of just one buyer. Rather, they sold to whichever buyer offered to pay them the most for their merchandise. O'Neal and Toby Johnson also competed with each other, and with Thomas, for boosters. Rec. Vol. 74, at 18; Rec. Vol. 61, at 26, 181-82. Yet, at different times, when they were not selling stolen OTC and HBA to North Bridge, O'Neal and Toby Johnson sold their goods directly to Thomas. [3]

---

[2] There was no evidence that any of the other defendants' businesses operated any differently.

[3] O'Neal originally sold to Thomas when Thomas was selling to Phillips, but O'Neal stopped selling to Thomas because he did not get along with Thomas and Phillips. Rec. Vol. 74, at 181-185; Rec. Vol. 61, at 170-72. Later, after Thomas was no longer involved with North Bridge, O'Neal also sold stolen OTC and HBA to Hale and Spittel. J.A. 1239. Rec. Vol 61, at 173; J.A. 1241-44, 1246-48. Toby Johnson originally sold stolen OTC and HBA to defendant Bill Cruse, but he switched from Cruse to North Bridge because he liked Hale better than Cruse. J.A. 1170-71, 1174-75, 1180-82. Later, when Thomas was buying OTC and HBA to sell directly to New York buyers, Johnson sold stolen OTC and HBA to him for two months before he (Thomas) was arrested. J.A. 285, 1193-94. Johnson had not conducted business with Thomas before because they were competitors and did not like each other. J.A. 1193. But Thomas offered Johnson a much better price on OTC and HBA than Hale paid, so Johnson switched from North Bridge to Thomas. J.A. 1194.

11

Among the purchasers of North Bridge's OTC and HBA were two sister companies located in Beltsville, Maryland, American Wholesale Drug and American International Wholesale Drug (collectively, American Drug). J.A. 1165, 1194-1200. North Bridge also resold Thomas's stolen OTC and HBA to redistributors in New York, like Parisi. J.A. 1443-46. Before selling the OTC and HBA that it bought from Thomas, O'Neal and Johnson to Parisi or American Drug, North Bridge cleaned the product thoroughly at its warehouse. J.A. 1166-67.

In December 1993 York suggested that Thomas could get back at Phillips for underpaying for OTC and HBA earlier that fall by selling OTC and HBA directly to Best Deal's customers in New York. Thomas did not know whom Best Deal's customers were, J.A. 999, but York did (because he worked for Best Deal), and he (York) agreed to introduce Thomas to them for a fee, see J.A. 278. York also agreed to help Thomas clean and package the OTC and HBA properly, so that the New York wholesalers would accept the goods. J.A. 885, 1392, 706, 834, 526. For this venture, York and Thomas formed a company, HBA Liquidators. J.A. 662, 709, 891, 995-96, 2141. Under the auspices of HBA Liquidators, York and Thomas delivered several loads of stolen OTC and HBA to wholesalers in New York. J.A. 886, 1255-57. York also helped unload stolen OTC and HBA from the vehicles of various fences who delivered to Thomas. J.A. 1393.

For advice on how to deal with the New Yorkers, Thomas and York contacted defendant Bill Cruse. J.A. 834, 1378. Cruse operated a salvaged goods grocery store, The Food Outlet, in Shelby, North Carolina. One of Cruse's main sources of merchandise was Family Dollar Stores, Inc., a national chain of small grocery stores. J.A. 1589. Cruse gave Thomas and York some advice on starting a salvaged goods business, J.A. 834, and provided Thomas and York with some sample letterhead for HBA Liquidators, J.A. 890, 2141.**4**

_____

**4** Cruse did not often buy salvaged OTC and HBA from Family Dollar, but he did buy two large shipments of it, see infra part III.B.1.a. The only OTC Cruse bought from Thomas, though, was a box of Tylenol that Thomas told Cruse he purchased from the Garner police department. J.A. 1346-47.

12

From the start, Thomas and his wife suspected that York was working undercover for the police. See Rec. Vol. 91, at 187 (discussing Thomas's testimony). In February 1994, after just one month of work with York, Thomas excluded York from his business. J.A. 891, 2158. Thomas then contacted Cruse and offered to pay Cruse a fee to help find new customers in New York to buy OTC and HBA. J.A. 278, 897. Cruse agreed, and he also helped Thomas deliver the OTC and HBA to New York. J.A. 897-903. Subsequently, Cruse introduced Thomas to defendant Isaac Ebert and defendant Mike Kazinec, who operated M&I Distributors, Inc. (M&I) in Brooklyn, New York. J.A. 278, 733, 900-903. Thomas and Cruse delivered the first shipment of Thomas's stolen OTC and HBA to M&I in March 1994. J.A. 901, 2158. After making a couple of trips with Cruse, Thomas decided that it was too expensive to continue paying him, so he cut Cruse out and began dealing with M&I directly. J.A. 998. Thomas, along with an associate, Henry Spikes, J.A. 731-32, delivered OTC and HBA to M&I approximately every other week. J.A. 2771, 2143. Between March 1994 and July 1994, M&I purchased over $700,000 in stolen OTC and HBA from Thomas, paying both in cash and by check. J.A. 734, 914, 2158, 2771. M&I resold this merchandise to Allou Distributors, Inc., a large, publicly traded wholesale company. J.A. 1494, 1512. Allou sells a wide range of OTC and HBA, some of which it obtains from "secondary sources with access to close-out purchases from retailers." J.A. 2933.

While doing business with M&I, Thomas often quarreled with Ebert and Kazinec about "damaged" OTC and HBA, that is, anything that could not be passed off to M&I's customers as brand new, including "short-dated" goods (items with less than 12 months until the expiration date). J.A. 736. M&I would not buy damaged OTC and HBA, J.A. 2932, because it would not sell. Ebert and Kazinec constantly found OTC and HBA that they considered damaged in Thomas's shipments, and they refused to pay his set price. Fed up with Ebert and Kazinec's incessant complaining about damaged goods, Thomas stopped selling his OTC and HBA to M&I. J.A. 931.

In July 1994 Hale brought Thomas to Beltsville, Maryland, to meet Joshua Gilat, the owner of American Drug, J.A. 937-39, and defendant Mark Eidelman, a buyer for the company, J.A. 947-50. While in Beltsville, Thomas sold $110,000 worth of stolen OTC and HBA to

13

American Drug. J.A. 938, 1260-62. Thereafter, until September 1994 Thomas made regular deliveries to American Drug, selling it a total of $617,000 in stolen OTC and HBA. J.A. 2158. American Drug paid for all of this merchandise by check. Rec. Vol. 39, at 52. Eidelman helped arrange these transactions and helped to make sure that Thomas's merchandise was in good condition for sale. J.A. 954-56. American Drug ran a cleanup operation to take price stickers and other identification marks off the OTC and HBA before it was resold. Like M&I, American Drug would not accept merchandise with"now" coupons (coupons redeemable at the check-out counter) on it, because manufacturers tracked such coupons and would know that the merchandise had not been sold by the company to which it originally had been delivered. J.A. 954-56.

Like North Bridge, American Drug was operated as a legitimate enterprise. Under Eidelman's direction American Drug bought millions of dollars of salvaged OTC from at least seventeen suppliers, many of which the government conceded were legitimate suppliers of secondary market goods. J.A. 1835, 2684-86, 2779-83; Rec. Vol. 39, at 52.

B. The Indictment

Thomas was arrested on October 31, 1994, during a police raid of D&C Imports. The police had been investigating him for over a year. Thomas immediately agreed to cooperate with the authorities, and he recorded a series of telephone conversations with Eidelman and others. J.A. 966, 2099-2140. As a result of Thomas's cooperation, all the defendants who appeal here were indicted for one count of conspiracy, in violation of 18 U.S.C. §§ 371 and 1956(h). The third superseding indictment charged a single conspiracy among Thomas, the defendants, and Thomas's boosters and fences, which operated between 1992 and October 31, 1994. J.A. 271-72. This conspiracy's three alleged objects were to (1) transport and (2) receive stolen goods worth more than $5,000.00 in interstate commerce, and (3) engage in financial transactions affecting interstate commerce with the proceeds of the transportation or receipt of stolen goods for the purpose of furthering the transportation or receipt of more stolen goods (that is, money laundering). J.A. 271-73, 285. The indictment explained the conspiracy's operation in detail and set forth eighty-one

14

overt acts. J.A. 275-79, 279-85. The indictment described the flow of stolen OTC and HBA quite specifically: the merchandise passed from fences and boosters -- through Thomas-- to Best Deal, North Bridge, M&I, and American Drug. J.A. 275-85.

The third superseding indictment also charged most of the individual defendants with substantive counts of (1) knowing transportation of stolen goods in interstate commerce, in violation of 18 U.S.C. § 2314, (2) knowing receipt of stolen goods in interstate commerce, in violation of 18 U.S.C. § 2315, and (3) money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I). All of the substantive counts involved transactions between one or more of the eleven defendants and Thomas (or the laundering of the proceeds of the transactions between these defendants and Thomas), and none related to transactions between the defendants and other fences, like Bob O'Neal and Toby Johnson. J.A. 285-301. In fact, the indictment made no mention of any transactions in stolen property other than those between Thomas and his fences and those between Thomas and the defendants.

C. The Trial

The defendants were tried together. At trial the government did not claim that any of the defendants were involved with the network of boosters and fences, so the defendants offered to stipulate that the OTC and HBA they bought from Thomas (or helped him sell) was stolen. The government refused and devoted about three weeks of the trial to proving that the OTC and HBA the defendants bought from Thomas was stolen. Thomas testified for eight days and spent much of that time explaining how he obtained his OTC and HBA from boosters and fences. Among other things, Thomas said that he often gave the boosters, many of whom were drug addicts, money to buy heroin. See J.A. 1124. Thomas never said that he told any of the defendants the source of his OTC and HBA, although he indicated that four defendants, York, Ebert, Kazinec, and Eidelman, knew that he dealt in stolen OTC and HBA. See infra part III.C.1. Thomas's wife and his daughter also testified about the family's stolen property operation. They backed up much of what Thomas said about his own illegal activities, but they did not implicate any of the defendants for knowingly buying (or selling) stolen property.

15

In addition, the government put on several fences who sold stolen OTC and HBA to Thomas, including Thomas's partner Curly Johnson and independent fences O'Neal and Toby Johnson. Curly Johnson explained how he bought stolen property for Thomas from drug-addicted boosters and said that he and Thomas helped out the boosters by lending them money to buy heroin. J.A. 795; Rec. Vol. 66, at 125-30. O'Neal and Toby Johnson testified solely about their own operations, including some of their own, separate OTC and HBA transactions with North Bridge. None of these fences testified that any of the defendants knew Thomas sold stolen OTC and HBA.

The government then introduced testimony from a lineup of Thomas's boosters to confirm that Thomas bought OTC and HBA shoplifted from various drug stores. Yet none of Thomas's boosters knew any of the defendants (and there was no evidence that any of these boosters sold to O'Neal or Toby Johnson). The government also adduced testimony from security personnel at several drug store chains in North Carolina concerning the amount of OTC and HBA stolen from their stores during Thomas's time in business. However, the government did not connect this stolen merchandise to Thomas, his fences, or any of the defendants.

At trial the defendants did not contest that Thomas ran a conspiracy to shoplift OTC and HBA from drug stores and resell it for profit. Nor did the defendants dispute that they bought OTC and HBA from Thomas that turned out to be stolen. In the case of York and Cruse, they did not dispute that they helped Thomas with the sale of OTC and HBA that also turned out to be stolen. Thomas and the defendants had documented their transactions in OTC and HBA as legitimate businesses would, with price lists, invoices, canceled checks and other detailed records. The defendants simply argued that they _were_ legitimate businessmen, who unwittingly bought stolen OTC and HBA from (or sold stolen OTC and HBA with) Thomas.

Thus, the defendants' trial strategy was twofold. First, they attempted to introduce evidence of their own legitimate business activities (some of which was excluded by the trial court) and information about other legitimate companies that dealt in "secondary market" OTC and HBA, like Allou Distributors.[5] Second, the defendants

_____

[5] According to the defendants, the secondary market "exists to deal with seasonable merchandise, unsold inventory, going out of business sales, and short[ ]-dated merchandise." Appellant Br. 10 n.13.

16

mounted a vigorous attack against Thomas. Through the cross-examination of Thomas the defendants established that he lied on his income tax returns, J.A. 1125-26; hired thugs to beat up a former associate who planned to testify against him, J.A. 980, 1128, 1131; hired an associate to shoot up another former associate's trailer home to "discourage" him from competing in the OTC and HBA business, J.A. 971-73, 1128-29, 1131-32; hired his son-in-law to set fire to Jay Phillips's house, J.A. 993, 1130; contributed to the delinquency of a minor, his own grandson, J.A. 1132-33; committed insurance fraud, J.A. 1133; avoided paying sales tax on what he sold, J.A. 1133; aided and abetted boosters in committing food stamp fraud, J.A. 1134; and hired someone to burn down the house of his daughter's former boyfriend, J.A. 990-92.

In its summation the government did not anchor its case on Thomas's testimony. Indeed, the government acknowledged that it would not have prosecuted the defendants if the case had been only a "finger pointing match between Dan Thomas and just about anybody on the planet." J.A. 1712. At the end the government was insisting that "Thomas was not the star witness," J.A. 1711, saying that its evidence either went beyond what he had to say or was corroborated by other witnesses or documentary evidence. J.A. 1711-12. Thus, the government also relied on the testimony of four "industry" witnesses, T. Wayne Daniels, Fred Simmons, Jimmy Thompson, and Dan Kane. Daniels was manager of a Winn Dixie "reclaim center," which handled damaged and discontinued products from 85 Winn Dixie stores (a discount drug store chain) in the Raleigh, North Carolina, area. J.A. 536. Simmons was coordinator of the Charlotte, North Carolina, reclaim center that serviced all 2,600 Family Dollar Stores in the Eastern United States. J.A. 640-41. Thompson operated his own salvaged goods company in Garner and bought 75 percent of his merchandise from Simmons at Family Dollar. Kane was chief operations officer of Nassi Bernstein Company, which conducted liquidation sales for retailers around the country. J.A. 1358. Each of these witnesses testified, in substance, that he had not encountered a market for salvaged or liquidated OTC and HBA in his own line of work. See infra part III.B.1.a. This testimony, the government claimed, proved that there was no legitimate market for salvaged and liquidated OTC and HBA, J.A. 1709-10, 1714-15, 1831-33; Rec. Vol. 97, at 55-57, 134; Rec. Vol. 100, at 97-101, or at least that the flow of good quality

17

salvaged or liquidated OTC and HBA was a "trickle" not a "river," J.A. 1834. Indeed, the government went so far as to argue that there was no secondary market whatsoever in OTC and HBA. Rec. Vol. 100, at 105-07. Since there was no secondary market for OTC and HBA, the government said, then all of the defendants were engaged in an elaborate "ruse," J.A. 1689, and their claim to sell secondary market OTC and HBA was just a cover -- "a bunch of bull," Rec. Vol. 97, at 57. Indeed, the government seemed to argue that everyone who purported to sell secondary market OTC and HBA was just a fence masquerading as an entrepreneur.

However, when pressed to explain what evidence showed that the defendants knew they were selling stolen OTC and HBA, the government turned to a different argument: all the defendants were guilty because they averted their eyes to the fact that the OTC and HBA Thomas sold was stolen. To support this claim, the government referred back to the testimony of Daniels, Simmons, Thompson, and Kane. According to the government, the testimony of these four witnesses proved that salvage and liquidation sales simply could not explain the volume and variety of new looking OTC that Thomas sold. J.A. 1709-10, 1829-30, 1832-33; Rec. Vol. 97, at 79, 81; Rec. Vol. 100, at 75, 99-101. Since the high volume and wide variety of quality OTC that Thomas sold could not have come from any legitimate source, the government urged, the only possible explanation for this was an "army of boosters and street thieves." Rec. Vol. 97, at 60; J.A. 705. Indeed, the government said the volume and variety of OTC that Thomas sold spoke for itself: due to the absence of a legitimate secondary market for OTC, the government argued, the defendants must have suspected that the real source of Thomas's stolen OTC was boosters. J.A. 1699, 1714-15, 1831-33; Rec. Vol. 97, at 59-60, 97, 122-27, 128, 134; Rec. Vol. 100, at 98-101, 104. Accordingly, the government argued, the defendants were "posturing ostriches," J.A. 1710, who "st[u]ck their fat head[s] in the sand" to avoid knowing that the OTC they bought from Thomas (or helped him sell to others) was stolen by shoplifters. J.A. 1689. This was the central theory that the government pressed in its closing argument.

To support this "indict the industry" type of theory, the government asked the district court to instruct the jury that it (the government) could meet its burden of proving that the defendants knew that Thom-

18

as's OTC and HBA was stolen if it proved the defendants were "deliberate[ly] or intentional[ly] ignoran[t]" of the source of Thomas's OTC and HBA. Rec. Vol. 37, at 19. The district court agreed. J.A. 1844. To prove this, the court said, the government was required to show that each defendant "deliberately closed his eyes to what would otherwise have been obvious to him." J.A. 1844.

All of the defendants who appeal here were convicted on the conspiracy count. The jury found that Phillips, Johnny Foster, Wayne Foster, Best Deal, Hale, Spittel, and York conspired to transport stolen goods and launder money, that Cruse conspired to transport stolen goods, and that Eidelman, Ebert, and Kazinec conspired to receive stolen goods and launder money. J.A. 1862-73. In addition, all of the defendants who were charged with substantive counts of transporting or receiving stolen goods or with laundering money were convicted on all of those counts, J.A. 1976-86, 2034-36, except Phillips, Wayne Foster, and Best Deal, who were acquitted on some of the money laundering counts, and Johnny Foster, who was acquitted on all of the money laundering counts, J.A. 2026-32.

The district court sentenced each defendant to prison (except Best Deal, which received probation, J.A. 2042-44). Ebert received 67 months, Kazinec 63 months, J.A. 1992-94, Eidelman 46 months, Hale 60 months, Spittel 57 months, J.A. 2053-55, Phillips 87 months, Wayne Foster 70 months, Johnny Foster 46 months, J.A. 2001-2, 2020-21, and York and Cruse each received 27 months, J.A. 2008, 2049. (Thomas, the kingpin of the conspiracy, was sentenced to just 30 months in prison. J.A. 971-73.)

III. ANALYSIS

On appeal the defendants argue that the district court committed reversible error by allowing the government to proceed under a deliberate ignorance theory.[6] We agree as to all defendants except Ebert,

_____

[6] In the alternative, the defendants argue that there was a variance between the evidence at trial and the allegations in the indictment. They claim that the government failed to prove the existence of the single conspiracy that was alleged to exist between Thomas and all the defendants.

19

Kazinec, and Eidelman, as to whom a deliberate ignorance instruction was harmless error. As we explain in detail below, there was no direct or circumstantial evidence supporting the instruction. Since the government offered no evidence whatsoever that seven of these defendants knowingly dealt in stolen OTC and HBA, we reverse their convictions. The district court should have directed a verdict for the seven defendants against whom the government offered no direct or circumstantial evidence of guilt. However, we conclude that instructing the jury on deliberate ignorance was harmless error for three of the other four defendants because there was evidence of their actual knowledge that the goods were stolen.

A. The Doctrine of Deliberate Ignorance

The central question on appeal is whether the government proved that the defendants knew Thomas was selling stolen OTC and HBA. In order to prove all the crimes charged -- transportation of stolen

_____

According to the defendants, the evidence proved (if anything) up to six conspiracies between Thomas and various defendants, plus a conspiracy between Steve Hale and Bob Spittel and two others. Since the trial court gave the jury a multiple conspiracy instruction, J.A. 1837-38, the question whether the proof showed one or many conspiracies was an issue for the jury. See United States v. Urbanik, 801 F.2d 692, 695 (4th Cir. 1986). The convictions must stand unless the evidence, taken in the light most favorable to the government, did not permit a rational jury to conclude that the defendants were part of a single conspiracy. Id.

Below, we conclude that a side conspiracy not alleged in the indictment, involving Hale and Spittle and two fences, Toby Johnson and Bob O'Neal, was proved at trial. See infra part III.B.2. But we need not decide whether the proof of this conspiracy was a prejudicial variance, and we need not address the other multiple conspiracy claims, because we reverse the convictions of Hale and Spittel on other grounds. See infra.

Because we reverse the convictions of seven defendants on legal sufficiency grounds, these defendants may not be retried for any of the crimes charged. See Burks v. United States, 437 U.S. 1, 17 (1978) (holding that retrial of a defendant whose conviction was reversed due to legal insufficiency violates the Double Jeopardy Clause).

20

goods, receipt of stolen goods, money laundering, and conspiracy to transport or receive stolen goods or launder money-- the government had to show that each defendant had knowledge that Thomas sold stolen OTC and HBA. See 18 U.S.C. §§ 2314, § 2315, 1956(a)(1)(A)(I), 371, 1956(h). In this case, the district court instructed the jury that proof of the defendants'"deliberate or intentional ignorance" would suffice for knowledge. J.A. 1844.

"Deliberate ignorance" (or "willful blindness") is a mental state distinct from actual knowledge that satisfies the requirement of many criminal statutes that a defendant have "knowledge" of an operative fact in order for his conduct to be criminal. See, e.g., United States v. Whittington, 26 F.3d 456, 463 (4th Cir. 1994) (transportation of stolen property); United States v. Campbell, 977 F.2d 854, 859 (4th Cir. 1992) (money laundering). A defendant's deliberate ignorance of an operative fact will suffice for actual knowledge of that fact if (1) the defendant was aware of a high probability of the existence of the fact (2) yet deliberately avoided learning whether the fact existed (3) with the conscious purpose of evading criminal liability, (4) unless the defendant genuinely believed that the fact did not exist. See Robin Charlow, Wilful Ignorance and Criminal Culpability, 70 Tex. L. Rev. 1351, 1413-18 (1992); cf., e.g., United States v. Baron, 94 F.3d 1312, 1318 n.3 (9th Cir. 1996); United States v. Cunningham, 83 F.3d 218, 221 (8th Cir. 1996); Whittington, 26 F.3d at 461-62; United States v. Fingado, 934 F.2d 1163, 1167 (10th Cir. 1991); United States v. Giovannetti, 919 F.2d 1223, 1228 (7th Cir. 1991); United States v. Mang Sun Wong, 884 F.2d 1537, 1543 (2d Cir. 1989); United States v. Caminos, 770 F.2d 361, 365 (3d Cir. 1985); United States v. Restrepo-Granda, 575 F.2d 524, 528 n.2 (5th Cir. 1978). The deliberate ignorance doctrine allows a jury to impute guilty knowledge to a defendant who strongly suspects (but does not know for sure) the existence of the operative fact that makes his conduct unlawful and "deliberately close[s] his eyes" to the existence of that fact in an attempt to avoid criminal liability, United States v. Mancuso, 42 F.3d 836, 846 (4th Cir. 1994). This doctrine is premised on the notion that a person who attempts to cheat the justice system by consciously preserving a lack of actual knowledge of a subjectively obvious fact is just as culpable as a person who has actual knowledge of that fact. See United States v. Sanchez-Robles, 927 F.2d 1070, 1073 (9th Cir. 1991); Giovannetti, 919 F.2d at 1228. A jury instruction on deliberate

ignorance is often called an "ostrich instruction," see, e.g., United States v. Forbes, 64 F.3d 928, 934 (4th Cir. 1995), or a "Jewell instruction," see, e.g., Sanchez-Robles, at 927 F.2d 1072, after the important Ninth Circuit case, United States v. Jewell, 532 F.2d 697, 700 (9th Cir. 1976) (en banc).**7**

Although an ostrich instruction "soften[s] somewhat" the government's burden of proving that the defendant had actual knowledge of a fact, such an instruction is not meant to reduce the level of intent to a showing of mere recklessness or negligence. See Campbell, 977 F.2d at 857. The doctrine of deliberate ignorance does not allow a jury to impute actual knowledge of the operative fact to a defendant just because he should have known of the existence of that fact. See id.; see also United States v. Heaps, 39 F.3d 479, 484 (4th Cir. 1994). Nor does the doctrine allow a jury to attribute actual knowledge to a defendant because he acted with reckless disregard to the possibility of the fact's existence. See, e.g., Whittington, 26 F.3d at 462; United States v. Martin, 773 F.2d 579, 584 (4th Cir. 1985). A genuine mistake of fact does not warrant conviction under a willful blindness theory, because a subjective belief that the operative fact does not exist, even if unreasonable, negates actual knowledge of that fact. See United States v. Sicignano, 78 F.3d 69, 71 (2d Cir. 1996); United States v. One 1973 Rolls Royce, 43 F.3d 794, 808 (3d Cir. 1994); Jewel, 532 F.2d at 707 (Kennedy, J., dissenting). To reiterate, knowledge is imputed on a willful blindness theory only when the defendant strongly suspects (but has no settled belief about) the truth and deliberately keeps himself ignorant of it in order to avoid punishment. See Baron, 94 F.3d at 1318 n.9.

Courts are "wary" of giving the ostrich instruction because of the possibility that the instruction might mislead the jury into believing that it may convict the defendant for his negligent or reckless disregard of the truth. Mancuso, 42 F.3d at 845; accord Giovannetti, 919 F.2d at 1228 ("The most powerful criticism of the ostrich instruction is, precisely, that its tendency is to allow juries to convict upon a find-

_____

**7** A "Jewell instruction" actually blends the principles set forth in the Jewell opinion with those advanced by the Jewell dissent, authored by then-Judge Anthony Kennedy. See United States v. One 1973 Rolls Royce, 43 F.3d 794, 808 n.11 (3d Cir. 1994).

ing of negligence for crimes that require intent."); see also One 1973 Rolls Royce, 43 F.3d at 809 n.13; Hilliard , 31 F.3d at 1517; United States v. Cassiere, 4 F.3d 1006, 1023 (1st Cir. 1993); United States v. Barnhart, 979 F.2d 647, 652 (8th Cir. 1992). Another serious concern is that the instruction might shift the burden to the defendant and force him to prove his innocence. See United States v. Sasser, 974 F.2d 1544, 1552 (10th Cir. 1992). Indeed, "[t]he effect of a Jewell [deliberate ignorance] instruction in a case in which no facts point to deliberate ignorance may be to create a presumption of guilt." United States v. Murrieta-Bejarano, 552 F.2d 1323, 1324 (9th Cir. 1977); accord United States v. de Francisco-Lopez, 939 F.2d 1405, 1411 (quoting Murrieta-Bejarano). Because of these potentials for harm, an ostrich instruction should be employed only "in those comparatively rare cases" where the facts "point in the direction of deliberate ignorance." Sanchez-Robles, 927 F.2d at 1073 (internal quotation omitted); cf. also Mancuso, 42 F.3d at 845 (citing Sanchez-Robles, 927 F.2d at 1073). An ostrich instruction is not allowed when the evidence shows that the defendant either had actual knowledge of the fact in question or no knowledge of that fact, and there is no evidence that the defendant was deliberately ignorant of the fact. See Alvarado, 838 F.2d at 314; United States v. Lara-Velasquez, 919 F.2d 946, 951 (5th Cir. 1990); United States v. Diaz, 864 F.2d 544, 550 (7th Cir. 1988); United States v. Manriquez Arbizo, 833 F.2d 244, 248-49 (10th Cir. 1987). Unless the evidence "support[s] the inference that the defendant was aware of the high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosection," the instruction is inappropriate. United States v. Brandon, 17 F.3d 409, 452 (1st Cir. 1994) (quoting Alvarado, 838 F.2d at 314); Barnhart, 979 F.2d at 652 (same); de Francisco-Lopez, 939 F.2d at 1409 (same).

This is not to say that the evidence supporting a Jewell instruction cannot be circumstantial. The circumstantial evidence of a defendant's conscious avoidance of the truth may be sufficiently strong to warrant an ostrich instruction. See, e.g., Whittington, 26 F.3d at 463. For example, such an instruction is appropriate when highly suspicious circumstances made the defendant aware of the high probability of the existence of a fact, yet he failed to act on an obvious opportunity to learn of the fact's existence. See Barnhart, 979 F.2d at 652;

23

see also, e.g., United States v. Guay, 108 F.3d 545, 551 (4th Cir. 1997); Whittington, 26 F.3d at 463-64; Cunningham, 83 F.3d at 222. In such a case the jury could infer that the defendant took strides to keep from knowing the truth because the only way he could have avoided knowing the truth was by making a conscious effort to do so. Or the jury could conclude that the defendant engaged in deliberate psychological avoidance of the truth by closing his mind to it. See Giovannetti, 919 F.2d at 1228-29. In either case the jury could impute knowledge to the defendant (so long as the facts showed that he avoided obtaining actual knowledge in order to evade criminal liability, and not for some other, innocent reason). Still, when a court gives an ostrich instruction based on circumstantial evidence of deliberate ignorance, the concern that makes courts "wary" of an ostrich instruction -- that the jury might convict the defendant based on a negligent (or reckless) failure of curiosity -- is heightened.

B. The District Court's Ostrich Instruction

We review a trial court's decision to instruct the jury on willful blindness for an abuse of discretion. See Whittington, 26 F.3d at 463. When deciding whether an ostrich instruction was warranted, we view the evidence in support of the instruction in the light most favorable to the government and grant the government all favorable inferences that can reasonably be drawn from the evidence. See id. at 463 n.6. Of course, no ostrich instruction may be given based on impermissible or unsupported inferences.

The defendants claim that giving the ostrich instruction was error because it was unsupported by the evidence. They say there was no properly admitted evidence that any of them consciously avoided knowing that Thomas sold stolen OTC and HBA. The only direct evidence of willful blindness, they say, was improperly admitted evidence about some unrelated bad acts committed by Steve Hale and Bob Spittel. Further, the defendants argue that there was no circumstantial evidence of willful blindness. The government does not dispute that the evidence relating to Hale and Spittel, which it claims was properly admitted as substantive evidence of the larger conspiracy, was the only direct evidence of deliberate ignorance. However, the government contends that a considerable amount of circumstantial evidence supported the ostrich instruction for all the defendants.

24

According to the government, certain "highly suspicious circumstances" surrounded the defendants' interactions with Thomas, and these circumstances allowed the jury to infer that the defendants deliberately ignored that Thomas's OTC and HBA was stolen. The defendants retort that these circumstances simply did not exist, or even if they did exist, they were not highly suspicious.

We conclude that the government did not prove that Thomas's OTC and HBA business was highly suspicious to the defendants, and thus there was no circumstantial evidence showing the defendants' deliberate ignorance. Also, we conclude that Hale and Spittel's willful blindness related to a separate conspiracy. Accordingly, no properly admitted evidence supported the ostrich instruction.

1. Circumstantial Evidence of Deliberate Ignorance: The Allegedly "Highly Suspicious" Circumstances

The government advanced five allegedly "highly suspicious circumstances" as proof that the defendants were deliberately ignorant of the real source for Thomas's OTC and HBA, retail theft. First, the government contended that there was only a small amount and a limited variety of good quality salvaged or liquidated OTC available. This allegation formed the basis for the government's claim that there was no possible legitimate secondary market source for OTC of the volume and variety that Thomas sold. Second, the OTC and HBA Thomas sold was usually packed in plain brown boxes and plastic bags rather than in factory cartons. Third, both Thomas and the defendants took steps to make the OTC and HBA they purchased from Thomas suitable for resale by removing old identification stickers, price tags, and security devices. Fourth, the government contended that the price the defendants paid to Thomas for supposedly salvaged or liquidated OTC and HBA was lower than the price that wholesalers paid to manufacturers for the same products, brand new. Fifth, the government said, the defendants only accepted OTC and HBA that could be passed off as new and refused to accept OTC and HBA with the "normal indicia" of salvaged goods.

We conclude that the evidence at trial was insufficient to establish the existence of circumstance one and that there was no evidence that the defendants knew about circumstances one (if it existed), three, and

25

four. Also, circumstances two through five were not shown to be highly suspicious because circumstances two through four were entirely innocuous, while circumstance five could only have been evidence of actual knowledge. Thus, the government utterly failed to show that the defendants were aware of highly suspicious circumstances and refused to act on an obvious opportunity to investigate them. Without such proof there was no circumstantial evidence of deliberate ignorance. See, e.g., Baron , 94 F.3d at 1318; Barnhart, 979 F.2d at 652.

a. Circumstance One: "No Legitimate Secondary Market in OTC"

The first supposedly suspicious circumstance -- that the actual market in salvaged and liquidated OTC produced only a small amount and limited variety of high quality OTC compared to what Thomas sold -- was the crux of the government's circumstantial case of deliberate ignorance. Much of the government's summation and rebuttal was devoted to this argument, J.A. 705, 1699, 1709-10, 1714-15, 1831, 1832-33; Rec. Vol. 97, at 55-59, 120; Rec. Vol. 100, at 97-99, 101. In support of its claim that there was no legitimate secondary market for OTC, the government offered the testimony of T. Wayne Daniels, Fred Simmons, Dan Kane, and Jimmy Thompson. Daniels, manager of the Raleigh-area Winn Dixie reclaim center, testified that Winn Dixie had an agreement with McNeill Industries, the maker of Tylenol products, to sell back recalled, damaged, or discontinued products, J.A. 538-36, and that Winn Dixie had similar agreements with some unspecified number of other national manufacturers of OTC, J.A. 550. Daniels also said that Winn Dixie almost never sold OTC products like Tylenol as salvage. J.A. 538-39. Simmons, coordinator of Family Dollar's sole reclaim center, testified that at Family Dollar only damaged, defective, or out-of-date merchandise was sent to the reclaim center. J.A. 642. Simmons also explained that at Family Dollar "99.9%" of all unsold national brands of OTC were returned to the manufacturer or vendor. J.A. 642. Further, Simmons testified that during any 30-day period his reclaim center handled only about two hundred pieces of national brand OTC like Tylenol. J.A. 644. Thompson, the salvage dealer who bought most of his merchandise from Family Dollar, testified that he found "very little" good quality OTC at drug store sales, that he had never possessed at one time even

26

a hundred bottles of any "name brand" OTC, J.A. 639, and that he had never known of a salvage dealer who dealt exclusively in OTC, J.A. 638. Kane, who handled hundreds of liquidations a year between 1991 and 1995, J.A. 1359-60, testified that at the liquidation sales he conducted, "a large portion" of national brands of OTC was "gone during the early stages" of the sale. Kane also said that OTC was virtually non-existent after it was discounted by over 30 percent off the retail price. J.A. 1361.

We conclude that the testimony of Daniels, Simmons, Thompson, and Kane offered no support for an ostrich instruction because their testimony was insufficient to prove that there was no market for high-quality salvaged and liquidated OTC. Moreover, even if this testimony had shown that there was no market in such goods, it did not prove that this fact aroused the defendants' suspicions about the OTC Thomas sold.

i. The Failure to Prove That There Was No Secondary Market

In its rebuttal closing argument, the government stated with regard to the legitimate secondary market for OTC, "you will have a trickle of this kind of product, but what you are not going to have is a river." J.A. 1834. However, neither Daniels, Simmons, Thompson nor Kane said that the flow of OTC to the secondary market was a "trickle" rather than a "river." Indeed, none of these witnesses could have made such a statement since none of them professed to have personal knowledge about the size of the secondary market for OTC. See Fed. R. Evid. 602 (witnesses may only testify about personal knowledge). Of course, if there was absolutely no legitimate secondary market for OTC, these witnesses could not have had personal knowledge about its size. But none of these four witnesses testified that there was no legitimate secondary market for OTC. Nor could they have done so. Testimony about the non-existence of a legitimate secondary market in OTC would have been "negative evidence," that is, evidence of the non-existence of a fact. Negative evidence lacks probative value unless the proponent first lays a proper foundation to show that the witness would have been aware of the fact if it did exist. See 2 John Henry Wigmore, Evidence in Trials at Common Law § 664, at 907-08 (James H. Chadbourne rev. 1979); 31A C.J.S. Evidence § 209, at 406-07 (1965). Here, the government laid no foundation to show that Dan-

27

iels, Simmons, Thompson, and Kane would have known of the absence of a legitimate secondary market for OTC, so testimony to that effect from these witnesses would have been inadmissible.

Of course, an expert on the secondary market for OTC (or, perhaps, an expert on secondary markets generally) could have testified about the size of that market. Experts, unlike ordinary witnesses, are given "wide latitude" to offer opinions not based on first-hand knowledge or observation when the subject matter is within their competency. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); see Fed. R. Evid. 702, 703. But Daniels, Simmons, Thompson, and Kane were not qualified at trial as experts on the secondary market for OTC, or even as experts on secondary markets generally. Quite to the contrary, these four witnesses were anything but experts. A review of their testimony shows that none of them dealt with OTC very often and that all of them admitted that they had no knowledge about secondary markets, in OTC and HBA or otherwise. Further, none of these four witnesses even implied that they had knowledge beyond his own experience, since all four confined their testimony to their own personal experience. In fact, each witness admitted that he did not even know whether, in his own line of business, the experience of others with OTC was similar to his own. J.A. 562-63, 583-84, 593, 629-30, 646, 654.

The government admits that Daniels, Simmons, Thompson, and Kane were not experts, but argues that there was no need to qualify them as such. Appellee Br. 40-41. According to the government, these four witnesses were "a representative sample of persons who were knowledgeable about how OTC was handled," and their testimony "support[ed] the reasonable inference that no significant and legitimate secondary market existed for OTC." Appellee Br. 41. The government apparently means that, although neither Daniels, Simmons, Thompson, or Kane personally knew anything about the size of the secondary market for OTC, the combined testimony of these witnesses was an adequate basis for the jury to extrapolate about the size of that market. This argument fails because Daniels, Simmons, Thompson, and Kane were not a representative sample of anything and because the government's reading of their testimony is seriously flawed.

28

**Volume 2 of 2**

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

YITSCHAK EBERT, a/k/a Isaac, d/b/a
      No. 96-4871(L)
M&I Distributors, Incorporated,
a/k/a Isaac Ebert, a/k/a Issac Ebert,
a/k/a Yitzchok Ebert,
<u>Defendant-Appellant.</u>

(1) Why the Witnesses Were Not a Representative Sample

(a) <u>They Did Not Represent Persons in the Salvage and Liqui-
dation Industry</u>

Even if the jury could have concluded that Daniels, Simmons,
Thompson, and Kane saw no OTC (or just a small amount) in or
headed for the secondary market, it could not have concluded that
there was no "river" of secondary market OTC because the govern-
ment did not show that these four witnesses' experience was represen-
tative of others in their occupations.

Thompson was a single salvage vendor. Although he said that he
rarely saw good quality salvaged OTC available for sale, the govern-
ment offered no evidence that this experience was common among
salvage vendors. Without such evidence the jury had no basis to infer
that there was little salvaged OTC to be found anywhere.[8] This same
problem rendered irrelevant Thompson's statements that he rarely
dealt in salvaged OTC and that he never met a salvage dealer who
dealt exclusively in OTC. Since Thompson never said whether he
knew a lot of salvage dealers, the fact that he rarely dealt in OTC and
had met no salvage vendors who did so exclusively also proved noth-
ing. From his testimony, a jury could not know whether other salvage
vendors rarely sold OTC or whether he was an exception to the rule.
Moreover, there was no reason for the jury to know whether Thomp-
son's failure to know OTC-only salvage vendors was attributable to
there being none or to his knowing the wrong people. Indeed, the gov-
ernment's concession that Thompson was not an expert on the salvage
industry suggests that his experience in that industry was not repre-
sentative of his profession as a whole.

_____

[8] Thompson's statement that he rarely saw salvaged OTC was not pro-
bative of whether such OTC was available because it was negative evi-
dence without a foundation. <u>See Wigmore</u>, <u>supra</u>, at 907-08. The
government did not show that Thompson ever looked for salvaged OTC
or that he looked for it in the right place at the right time. Without this
foundation, Thompson's testimony was irrelevant because reasons other
than the non-availability of salvaged OTC could explain why he rarely
saw it. He may have looked for salvaged OTC in the wrong place or at
the wrong time, he may not have looked carefully, or he may not have
looked at all.

30

Kane's testimony does not support the government's claim that there was no secondary market for OTC because he, too, offered no evidence that his experience with OTC was universal in his line of work. Kane offered his own, entirely anecdotal, perspective on the liquidation sale industry. He testified that OTC disappeared early at the liquidation sales he conducted; however, this gave the jury no reason to conclude that the same thing happened at other liquidation sales. He said nothing that would allow the jury to conclude that his experience was representative of what others in his line of work saw. In fact, the government's admission that Kane's own experience did not qualify him as an expert on liquidation sales leads us to conclude that the government did not prove that his experience was representative of others in that industry.

The testimony of Daniels and Simmons (the reclaim center managers) also was insufficient to support the inference, urged by the government, that little or no national brand OTC is sold as salvage because it all goes back to the manufacturer. Although the government offered two reclaim center managers (and only one salvage vendor and one liquidation sale professional), the government did nothing to prove that the experiences that the reclaim center managers, Simmons and Daniels, had with OTC were the same as other reclaim center managers, for three reasons. First, only Simmons, Family Dollar's sole reclaim center coordinator, could say that most of the OTC sent to his company's reclaim center was sent back to the manufacturer. Daniels was just one of any number of Winn Dixie reclaim center managers, and he only knew what happened at his own reclaim center. Daniels did not say whether vendors besides McNeill Industries required Winn Dixie to return or destroy undesirable OTC, and he did not even know if other Winn Dixie managers complied with McNeill's wishes. Thus, although Daniels himself rarely sold OTC to salvage dealers, there was no evidence that this was the general rule at Winn Dixie. Second, Family Dollar and Winn Dixie were only two retailers who sell OTC. Daniels himself testified that at least seven other major drug store chains in North Carolina alone operated reclaim centers, and the jury could not have known whether there were reclaim center managers for these stores (or others not mentioned) whose experience differed from that of Daniels and Simmons. Plus, the government offered no evidence to suggest that these other retailers treated OTC the same as Family Dollar and Winn Dixie did.

31

The simple fact that two retailers contracted with some OTC manu-facturers to return undesirable OTC for a store credit does not support an inference that all (or even most) other retailers had the same type of agreement with all (or even most) other OTC manufacturers. Only one company, McNeill Industries, was shown to have announced a policy requiring return of all unsold OTC, and there was no evidence that McNeill wrote that policy into its contract with all retailers. Third, neither Daniels nor Simmons, both of whom obtained their positions in 1993 and 1994, respectively (when Thomas's stolen OTC and HBA operation was already in full swing), knew whether his company returned OTC to the manufacturer prior to his tenure. In fact, Daniels admitted on cross-examination that McNeill changed its policy in June 1993, before which time McNeill apparently did not demand that Winn Dixie return all unsold OTC. Therefore, neither Daniels nor Simmons even knew whether his own company returned all OTC to McNeill (or other OTC manufacturers) for much of the time that Thomas's stolen property ring existed.

(b) The Witnesses Did Not Testify About Accidents

Even if Daniels, Simmons, Thompson, and Kane had spoken with authority about their own occupations, they all only testified about two possible sources of the secondary market for OTC, salvage and liquidation sales. As a result, the government offered no evidence to foreclose other possible legitimate sources of secondary market OTC like that Thomas sold (that is, individual items, not factory cases). One source of single-piece OTC comes immediately to mind: inci-dents where the factory carton is destroyed or damaged in an accident and the product is sold off in individual lots (perhaps because the retailer will not accept individual items, even if the packaging is intact). Such accidents could occur in a number of ways (a forklift ripping a box, a truck wrecking on the highway and spilling its cargo, an employee dropping a carton off a shelf in the warehouse), and it is not unreasonable to think that the combined fruits of such accidents could produce a large source of secondary market OTC. Although the government insisted that accidents led to just a trickle of OTC, Rec. Vol. 97, at 60, it offered no proof to back up this claim, and the jury could not simply guess that accidents are not common. The govern-ment simply failed to prove that there was no thriving secondary mar-ket in OTC resulting from accidents.

32

(2) Why the Government Misread the Witnesses' Testimony

Moreover, even if the testimony of Daniels, Simmons, Thompson, and Kane had been sufficient to support an inference about the size of the secondary market for OTC, a rational jury could not have drawn an inference from the testimony that there was no legitimate market for such OTC (or that it was a trickle rather than a stream). If Daniels and Simmons's testimony had been sufficient to support any conclusion about a secondary market for OTC, the only conclusion a rational jury could have drawn was that there was a secondary market in OTC. This is because, even assuming Kane's testimony was sufficient evidence from which a rational jury could have inferred that liquidation sales were not a source for secondary market OTC, Daniels and Simmons's testimony suggests just the opposite with regard to salvaged OTC.

A thorough review of the record reveals that Daniels said many things that undermined the government's argument that there was no large secondary market in good quality salvaged OTC. Daniels testified that the reclaim center sometimes received "really good [OTC] but maybe they are changing the size of the package." J.A. 539, 570. In fact, he said that when merchandise is sent to the reclaim center as "damaged," often only one item in a package that contains multiple items would be damaged -- the rest had "nothing wrong with them." Rec. Vol. 98, at 25. Daniels also explained that when undesirable merchandise was shipped from Winn Dixie stores to the reclaim center, the store was automatically credited (and the vendor was automatically charged) for the full price of each item, no matter whether the vendor received that merchandise or not. J.A. 537-39. Daniels said that Winn Dixie gave the vendor 30 days to pick up undesirable merchandise, including OTC, and that Winn Dixie disposed of unclaimed merchandise by (among other things) dumping it in the trash or selling it to salvage dealers. J.A. 537. Further, although Daniels testified that Winn Dixie's contract with most OTC vendors required that undesirable OTC be destroyed or returned, he admitted that Winn Dixie sold "some" OTC to salvaged goods dealers "at [its] own discretion." J.A. 550. Indeed, Daniels sold an unspecified amount of undamaged, unexpired OTC to Jimmy Thompson, J.A. 550-51, which Thompson resold to another salvage dealer, J.A. 620-22. Daniels also acknowledged that Winn Dixie "destroyed" OTC by discarding it into

33

a dumpster, and he did not know what happened to the OTC after that. J.A. 551.

Some of Simmons's testimony also undermined the government's contention that the market in salvaged OTC was negligible. Simmons acknowledged that sometimes OTC was recalled when it did not sell well, Rec. Vol. 68, at 47-48, 105-06, 137, or when the manufacturer decided to change the packaging, Rec. Vol. 68, at 124; Rec. Vol. 68, at 159-60. He also admitted that, while stores were supposed to return only defective or damaged OTC to the reclaim center, Rec. Vol. 68, at 46, 86, sometimes large crates of OTC were sent to the reclaim center as "damaged" when only a few individual boxes in the crate were damaged. Rec. Vol. 68, at 103. Simmons admitted that often the real reason this merchandise was sent back to the reclaim center was that it was a slow seller. Rec. Vol. 68, at 104. Simmons also admitted that while most national brands of OTC were supposed to be returned to the manufacturer, J.A. 643; Rec. Vol. 68, at 158, and while Family Dollar's policy was to always "return" recalled national brand OTC to the manufacturer, Family Dollar sometimes handed the product over to an independent broker working on the manufacturer's behalf, who was supposed to return or destroy the OTC, J.A. 125; Rec. Vol. 68, at 95, 128. In general, Simmons did not know what brokers did with these products after they left Family Dollar. Rec. Vol. 68, at 141. However, he knew of instances where brokers received OTC from a retailer on the manufacturer's behalf, obtained a credit from the manufacturer, and then resold the product instead of destroying it (as the broker's contract with the manufacturer required). Rec. Vol. 68, at 95, 96. In addition, Simmons said that sometimes Tylenol and other national brands of OTC got mixed in with other merchandise that was sold to salvage dealers, J.A. 650, 651. Indeed, Simmons admitted that Family Dollar sold Bill Cruse a huge load (13 pallets worth) of salvaged OTC and HBA in January 1995. Rec. Vol. 69, at 49, 52-54. Simmons then explained that he later sold another huge load of OTC and HBA to Cruse (18 pallets, or 340 cartons, Rec. Vol. 68, at 87-88), J.A. 653, Rec. Vol. 68, at 153-54. The OTC he sold to Cruse included some perfectly good product that had been returned or had sold poorly. Rec. Vol. 68, at 62-75.

In fact, Simmons's testimony about the OTC he sold to Cruse suggests that there could be a large market in salvaged OTC. Simmons

34

testified that he sold OTC to Cruse even though he was supposed to dispose of OTC in accordance with Family Dollar's agreement with the manufacturer, which specified that the product was to be destroyed, J.A. 642, 647-51. Simmons said that this was a "common" practice at Family Dollar, which the manufacturer tolerated. Rec. Vol. 68, at 99, 127, 130. Simmons also said it was "common sense" that any reclaim center would sell OTC, rather than destroy it, to make a profit for the company. He also added that Family Dollar approved of his decision to sell the OTC to Cruse in violation of its contract for just that reason. Rec. Vol. 68, at 128-29. In addition, Simmons said that the markup on pharmaceuticals was low, and further, that Family Dollar charged the vendor a handling fee in addition to the price of the merchandise whenever OTC was returned to the reclaim center, J.A. 644. As a result, Simmons admitted, Family Dollar could make more money by recalling slow moving OTC and selling it for salvage than it could make by selling the product in the store. Rec. Vol. 68, at 131, 157.

In sum, Daniels and Simmons both admitted that on occasion they sold OTC to salvage dealers, despite their companies' contractual duty to destroy it. Daniels and Simmons also did not know what happened to undamaged OTC once they "destroyed" it or sent it back to the manufacturer. If other reclaim center managers operated the same as Daniels and Simmons, it is very possible that much OTC found its way into the secondary market. Further, Simmons admitted that in his experience it was common and accepted practice for retailers to sell salvaged OTC that was supposed to be destroyed, and indeed, it made economic sense to do so. Even taken in the light most favorable to the government, this testimony could only be interpreted in one way: that contrary to the government's claims, it was likely that there was an active secondary market for good quality OTC, which retailers had promised to destroy but instead sold as "salvage."

### ii. The Failure to Prove the Defendants Knew There Was No Secondary Market

Even if the government had proved that there was no legitimate market in salvaged and liquidated OTC, it still failed to prove that the defendants were aware of the non-existence of this market. Daniels, Simmons, Thompson, and Kane said nothing about the defendants'

35

knowledge of the secondary market for OTC, and there was no other evidence in the record that any of the defendants knew any fact that would have suggested to them that there was no secondary market for salvaged or liquidated OTC.

None of the defendants were shown to know any of the facts testified to by Daniels, Thompson, Simmons, and Kane, which led the government to contend that there is no secondary market for OTC. There was no evidence that the defendants knew Thompson did not see much salvaged OTC or that he had never known a salvage dealer who specialized in salvaged OTC. Indeed, since Thompson did not know Thomas, even if the defendants knew what Thompson knew, the defendants could still believe that they all knew one salvage dealer who specialized in OTC -- Thomas. Also, none of the defendants were shown to know how the reclaim center for Winn Dixie or Family Dollar (or any other drug store chain) operated. Specifically, the defendants were not shown to know how often these reclaim centers sold OTC to salvage while under Daniels and Simmons' management (or at any other time). Indeed, the only defendant, Cruse, who purchased salvaged goods from Simmons and Daniels bought OTC from both men. Moreover, no evidence was produced to show that any of the defendants knew McNeill Industries (or any other manufacturer of OTC) required Winn Dixie and Family Dollar (or any other retailer) to return its unsold products. So there was no proof that the defendants knew Simmons returned any of the Tylenol (or other OTC) that was recalled, much less "99.9%" of it. Finally, none of the defendants were shown to know that OTC "disappeared" by the time it was 30 percent off the retail price at the liquidation sales that Kane (or anyone else) conducted. After scouring the record, we conclude that there was no evidence that the defendants knew anything about the salvage and liquidation industries. As a result, there was absolutely no reason to conclude that the volume and variety of Thomas's OTC sales actually signaled to the defendants that this OTC was stolen. Therefore, the government failed to prove that the defendants had their own suspicions aroused, yet refused to investigate. See, e.g., United States v. Lara-Velasquez, 919 F.2d 946, 952-53 (5th Cir. 1990). Since the defendants were not shown to know that highly suspicious circumstances existed, the jury could not reasonably have inferred that the defendants failed to know the true source of Thomas's goods because they purposely contrived to remain ignorant. See,

36

e.g., United States v. Baron, 94 F.3d 1312, 1371 (9th Cir. 1996); United States v. Hilliard, 31 F.3d 1509, 1516 (10th Cir. 1994).

The government maintains, without further explanation, that the high volume and wide variety of OTC that Thomas sold was, by itself, adequate circumstantial proof of the defendants' willful blindness to support an ostrich instruction. Here, the government could be relying on one of two theories, both of which we reject. First, the government could be suggesting that a rational jury could have inferred that the defendants simply knew that the high volume of good quality OTC Thomas sold was suspicious, in other words, that the volume of OTC Thomas sold "spoke for itself." This is a circular argument. This case is unlike the typical circumstantial case of willful blindness, where the government shows that the defendant knew of certain circumstances and a rational jury could infer that knowing those circumstances made the defendant himself suspicious because the circumstances were suspect on their face. See, e.g., United States v. Guay, 108 F.3d 545, 551 (4th Cir. 1997) (concluding that the ostrich instruction was proper when the defendant "claimed that he accepted $20,000 to transport, without inquiry as to the contents, several bags belonging to a man he met at a truck stop"). Here, although the defendants certainly knew the volume and variety of OTC they bought from Thomas, that fact was not suspicious on its face. This is confirmed by the government's own argument about why the testimony of Thomas's boosters and fences was necessary at trial. According to the government, "absent this testimony, the jury would have lacked a basis upon which to believe that the magnitude of OTC handled by Thomas could have been generated by retail thefts." Appellee Br. 44. If an average juror could not be expected to know that Thomas's OTC was stolen simply from the large volume he sold, then neither could the defendants.

Second, even if a reasonable person would have known all the facts testified to by Daniels, Simmons, Thompson, and Kane (and therefore, that the volume and variety of OTC Thomas sold was suspicious), an ostrich instruction was still inappropriate. When it comes to knowledge, a criminal defendant is not required to be a reasonable person. Mere negligence does not equate to actual knowledge, and an ostrich instruction does not change that. See United States v.

37

Campbell, 977 F.2d 854, 857 (4th Cir. 1992); United States v. Heaps, 39 F.3d 479, 484 (4th Cir. 1994).

Finally, even if it was assumed that each of the defendants was a professional fence posing as a legitimate businessman, the government still failed to prove that the defendants were willfully blind to the source of Thomas's OTC. This is because Thomas's OTC operation was of such an unusual size that even a fence who bought stolen OTC and HBA for a living thought it must have been legitimate. According to government witness Zeki Butris, a fence from Detroit who bought stolen OTC from shoplifters and sold it to wholesalers in New York, he simply could not believe that retail theft could produce the volume and variety of OTC that Thomas's operation produced. Rec. Vol. 97, at 88, 129. Since Butris, an experienced fence from a major city (and the only person who testified on this subject at trial), believed that the volume and variety of Thomas's OTC indicated that it was not stolen, a jury would reasonably conclude that the defendants must have thought the same, even if they, too, were professional fences.

b. Circumstance Two: Plain Brown Boxes

The second "highly suspicious" circumstance posited by the government, that Thomas sold and stored OTC and HBA in plain brown boxes rather than in manufacturer's packaging, was not objectively suspicious. Thomas claimed to deal in salvaged OTC and HBA, so it was quite apparent that his goods did not come straight from the factory. A reasonable person would expect that OTC and HBA might be salvaged from any number of places (for example, at a retailer's going out of business sale or in a dumpster behind a wholesaler's warehouse) where individual products are unlikely to be in any large container, much less neatly packed in their factory boxes. Even if the goods had been kept in their original cartons, one would expect that this packaging might be damaged or destroyed in the event (such as fire, water, or accident in a warehouse) that led to its being given up as salvage. Indeed, it is hard to conceive of a situation where true salvaged goods would retain their original packaging. So a reasonable person would expect that after a salvage dealer salvaged the OTC from wherever he found it, he would pack it in different containers, like brown boxes.

38

The evidence in the record also lends support to this view. According to government witness Wayne Daniels, whenever Winn Dixie sold merchandise to salvage dealers, including when it sold salvaged OTC and HBA to Bill Cruse, the merchandise was "all mixed up" in previously used banana boxes, not neatly packed in the manufacturer's cartons. J.A. 559-60, 570, 608-09. Although Daniels' testimony about his own personal experience was insufficient to prove that selling salvaged OTC and HBA in banana boxes was the general practice among grocery stores, J.A. 579, his testimony foreclosed the implication of the government's argument, that salvaged OTC and HBA was sold in factory cartons.

Moreover, even if the packaging of Thomas's OTC and HBA may have been suspicious, the government produced no direct or circumstantial evidence that the defendants themselves suspected that Thomas's OTC and HBA was stolen because it was stored in non-factory boxes. Thus, the packaging of Thomas's OTC and HBA did not offer any support for the district court's ostrich instruction.

c. Circumstance Three: Cleanup Operations

The third supposedly "highly suspicious" circumstance, that Thomas and the defendants all "cleaned" the stolen OTC and HBA by removing price tags, anti-theft devices, and marks made by the product's previous owner, was not in reality suspicious. First, as Thomas himself testified, secondary market businessmen keep the sources of their supply secret so that their customers do not cut them out and buy directly from the sources. (Indeed, Thomas's own actions proved how easy it is to cut out the middleman to increase one's own profits: Thomas himself repeatedly dumped his own customers in order to sell to their customers.) Thus, even if Thomas salvaged OTC from local retailers, the defendants could have expected him to take any identification marks off the product to conceal their origin. Second, if a salvage dealer does not take the retailer's price tags off the merchandise when he buys and sells it for less than the retail price, his buyer could cause the retailer to lose money by returning it to the retailer in exchange for the full retail price. For this very reason, the government's own witness, Fred Simmons, testified that whenever Family Dollar sold merchandise to salvage vendors, including when it sold OTC and HBA to Bill Cruse, the salvage dealer was contractually

39

obligated to remove all price tags and other Family Dollar labels from the merchandise before reselling it. Rec. Vol. 68, at 91-92, 93, 94, 125, 144, 150-52. As a result, Simmons agreed that "the fact that somebody has a clean-up operation is in no way sinister or bad or showing any evil intent." J.A. 652A, 2810. Third, common sense tells us that anyone who buys secondhand goods from a salvage dealer would have more luck reselling them to the public if they were cleaned to look like new, instead of goods from another store. Finally, since some of the defendants apparently were trying to pass off salvaged OTC as new (or were selling to redistributors who did so), it makes sense that they had cleanup operations. This type of upscale salvage selling, while deceptive, does not support a criminal conviction in this case.

In addition, the government produced no evidence that the defendants suspected that Thomas's cleaning operation, and the need for their own cleaning operations, meant that Thomas's OTC and HBA was stolen. As a result, the cleaning of Thomas's OTC and HBA offered no support for the ostrich instruction.

d. Circumstance Four: Price Below Wholesale

The government also failed to prove the existence of the fourth allegedly suspicious circumstance, that the prices that several of the defendants paid to Thomas for OTC and HBA were below the wholesale prices of these products. After a thorough review of the record, we find no evidence that the prices that the defendants paid Thomas for OTC and HBA were below wholesale prices in eastern North Carolina. The government offered evidence of the price the defendants paid for various of Thomas's OTC items, see J.A. 2597-2722, but it adduced no proof regarding the wholesale price of these items in North Carolina. Although there was evidence that some of the defendants resold some of the OTC they bought from Thomas to wholesalers, J.A. 2722, 2655-66, there was no evidence that the defendants bought or sold these goods at the accepted wholesale price. Even if a jury could infer that the defendants sold their goods at less than the wholesale price because they were selling to wholesalers, this was not suspicious because the defendants were buying OTC in eastern North Carolina and selling it in New York City or the Washington, D.C., area. It is commonly known that prices may be higher in major metro-

40

politan areas in the Northeast than in smaller cities in the South. In fact, government witness Joe Parisi testified that the "wholesale" price he paid to Thomas for stolen Tylenol in Brooklyn was higher than the "retail" price for the same product at a Wal-Mart in the South. J.A. 1549-51. Therefore, even if the defendants paid Thomas less than the wholesale price in New York and Washington, they may have believed that Thomas made his money by taking advantage of regional price differentials.**9**

Moreover, even if the defendants paid less than wholesale for OTC and HBA, this was not, by itself, objectively suspicious. Common sense dictates that if there is a market for salvaged or liquidated OTC and HBA, the price of goods in that market would necessarily be below the price that retailers pay wholesalers for the same goods. If not, no one would ever buy secondhand merchandise in bulk to resell to retailers. If a wholesaler could buy brand new merchandise for the same price (or a lower price) as secondhand merchandise, he surely would do so, since he is likely to be able to sell the former at a higher price.

Finally, even if a reasonable person would have been suspicious at the prices the defendants paid, the government offered no evidence that the defendants themselves were suspicious of these prices. There was simply no evidence that the defendants knew  that the prices they paid were "too good to be true." Compare United States v. Trigg, 119

_____

**9** Indeed, there is a large market in so-called "diverted goods" (that is, products sold by the manufacturer to wholesalers in one market for a lower price than in a second market, which are then resold in the second market by the wholesaler). See, e.g., Johnson & Johnson Products, Inc. v. DAL Int'l Trading Co., 798 F.2d 100 (3d Cir. 1986); United States v. Weinstein, 762 F.2d 1522, 1527 (11th Cir. 1985); Clairol, Inc. v. Boston Discount Ctr., 608 F.2d 1114 (6th Cir. 1979). These goods are called "gray market" goods because their resale is prohibited not by law but rather by the contract between the wholesaler and the manufacturer. Of course, the defendants admitted at trial that Thomas's operation did not resemble a large-scale diversion operation because Thomas sold individual items rather than factory cases. See Rec. Vol. 99 at 101 (referring to the defendants' admission). Nevertheless, the defendants could have still believed that Thomas tried to optimize the profits of his salvage operation by reselling salvaged goods in markets in the Northeast.

41

F.3d 493, 504-05 (7th Cir. 1997) (holding that a deliberate ignorance instruction was proper when the defendant was shown to know that the prices he paid for stolen computers were "too good to be true"). Therefore, the price the defendants paid for Thomas's goods did not support the giving of the ostrich instruction.

e. Circumstance Five: Refusal to Buy Damaged Goods

The government's fifth "highly suspicious" circumstance, that the defendants refused to buy goods that were slightly damaged, is neither highly suspicious nor evidence of willful blindness. First, although the government argues that salvaged goods are normally marked or damaged in some way, it did not prove this at trial. The only evidence in the record on this point was an offhand comment by Jimmy Thompson that people paid less for the items he sold because they were often damaged or out of date. However, there is no reason to believe that Thompson's experience was representative of most salvaged goods dealers. See supra part III.B.1.a. Plus, Daniels and Simmons's testimony suggested that a great deal of undamaged salvaged goods exist. Id. Further, the government is simply wrong to argue that the defendants all portrayed themselves as salvaged goods dealers, yet refused to accept even slightly damaged goods. The evidence at trial showed that the only defendants who complained to Thomas about "damages" were Eidelman, Ebert, and Kazinec. These three defendants did not hold themselves out as salvaged goods dealers. Rather, these defendants worked for wholesale companies, American Drug and M&I, respectively, which did not represent to their customers, wholesalers like Allou Distributors, that they sold salvaged goods. Therefore, it only makes sense that these companies, and the defendants that operated them, would not accept damaged goods.

Moreover, even if the government had proved that the defendants knew that their refusal to buy "damaged" OTC and HBA from Thomas was highly suspicious to others, this was no reason to give an ostrich instruction. The defendants' own refusal to accept damaged goods could not have been a highly suspicious fact to them because, of course, the defendants knew why they refused to buy damaged OTC and HBA from Thomas. The defendants either refused to buy damaged OTC and HBA because they were fences posing as salvage vendors, in which case they knew Thomas's OTC and HBA was

42

stolen, or because they only purchased (what they believed to be) good-as-new salvaged goods, in which case they did not know that Thomas sold stolen OTC and HBA. Either way, the defendants' refusal to accept damaged goods could not have been evidence that the defendants were willfully blind to the source of Thomas's OTC and HBA.**10** Rather, it was (if anything) circumstantial evidence that the defendants actually knew Thomas's OTC and HBA was stolen.**11** Thus, it was improper to give an ostrich instruction. See e.g., United States v. Sanchez-Robles, 927 F.2d 1070, 1075 (9th cir. 1991) (holding that a Jewell instruction was inappropriate when defendant either had actual knowledge or not; he either smelled marijuana and realized what he was transporting, or he did not recognize the smell and did not know what he was carrying). The facts simply required the jury "to make a `binary choice' between `actual knowledge' and `complete innocence,' [so] the ostrich instruction should not [have] be[en] given." United States v. Giovannetti, 919 F.2d 1223, 1228 (7th Cir. 1991); accord United States v. Erickson, 75 F.3d 470, 481 (9th Cir. 1996).

2. Direct Evidence of Willful Blindness: Hale and Spittel

Although the government did not make out a circumstantial case of willful blindness, there was direct evidence about acts of deliberate ignorance by two defendants, Steve Hale and Bob Spittel, in transactions that did not involve Thomas's operations. We conclude that this evidence was inadmissible. Toby Johnson and Bob O'Neal, two fences from Durham who bought stolen HBA and OTC from boosters and sold it to North Bridge, testified that Hale and Spittel both looked the other way, literally, to avoid watching transactions with boosters. According to O'Neal, on several occasions either Hale or Spittel was visiting his home to buy a load of OTC and HBA when a booster stopped by to sell some merchandise. Each time, O'Neal said, Hale

_____

**10** Although evidence of deliberate ignorance can also be circumstantial evidence of a defendant's actual knowledge, all circumstantial evidence of actual knowledge is not necessarily evidence of deliberate ignorance.
**11** Since the government offered no evidence that the defendants knew that salvaged OTC and HBA is usually damaged, we conclude the evidence was not even circumstantial evidence of the defendants' actual knowledge.

43

or Spittel avoided witnessing his transaction with the booster by walking out of the house, sitting on his porch, and playing with his dog. After the booster left, O'Neal explained, Hale or Spittel came back inside and completed the purchase of OTC and HBA. J.A. 1243-45. Toby Johnson testified that Hale and Spittel frequently stopped by his pawn shop to buy OTC and HBA when boosters were at the front counter selling him what was "obviously" stolen OTC and HBA. Each time, Johnson said, Hale or Spittel would avoid watching his transactions with the boosters by going in the back room of the pawn shop where the OTC and HBA was stored in crates. On these occasions, Johnson said, he went to the back room after he finished buying OTC and HBA from the boosters and sold a load of OTC and HBA to Hale or Spittel. J.A. 1179-80, 1189. Johnson also testified that he had a tacit understanding with Hale and Spittel not to discuss the source of the OTC and HBA he sold to them. J.A. 1180.

The government contends that O'Neal and Johnson's testimony was direct evidence of willful blindness which supported an ostrich instruction for Hale and Spittel. In addition, the government argues that since an ostrich instruction was warranted for some defendants, it was proper for the district court to give the instruction without limiting its application to any specific defendants. We need not address either of these arguments, however, because we conclude that O'Neal and Johnson's testimony was not "intrinsic evidence" of the conspiracy charged but was instead "extrinsic" evidence admitted in violation of Federal Rule of Evidence 404(b).

a. Rule 404(b): "intrinsic" and "extrinsic" evidence

Evidence of a criminal defendant's prior bad acts or crimes other than the crime charged (that is, "extrinsic" acts) tends to prove that the defendant had bad moral character or a propensity to commit crimes. Although such evidence is relevant in a criminal proceeding on the theory that the defendant's bad character or criminal propensity made it more likely than not that he committed the crime charged, it is strictly inadmissible on this theory. See Fed. R. Evid. 401, 404(b); United States v. Falls, 117 F.3d 1075, 1077 (8th Cir. 1997), cert. denied, 118 S. Ct. 1083 (1998); United States v. Murray, 103 F.3d 310, 316 (3d Cir. 1997), cert. denied, 119 S. Ct. 254 (1998). Therefore, unless the government first shows that (among other things) evi-

dence of the defendant's prior bad acts is relevant to prove something other than his bad character or propensity to commit crime, such evidence must be excluded. See United States v. Queen, 132 F.3d 991, 994 (4th Cir. 1997), cert. denied, 118 S. Ct. 1572 (1998). Here, the government claims that Johnson and O'Neal's testimony showed that Hale and Spittel deliberately avoided knowing whether OTC and HBA they purchased from Johnson and O'Neal was stolen. If so, this evidence tended to show that Hale and Spittel had bad moral character or a propensity to buy stolen OTC and HBA. It had no other relevance to their transactions with Thomas. Although this evidence was relevant to show that Hale and Spittel had the bad moral character or criminal propensity to buy stolen OTC and HBA, the district court should have excluded it unless the government showed that it was relevant to prove something other than Hale and Spittel's bad character or propensity to commit crimes. See Queen, 132 F.3d at 994. However, the government made no effort to do this. The government made no mention of Johnson and O'Neal's testimony in its pre-trial request to admit certain 404(b) evidence, and it did not notify the defendants of its intent to introduce this testimony as Rule 404(b) requires. The government also did not argue in district court that Johnson and O'Neal's testimony was relevant to prove some thing other than Hale and Spittel's bad character or propensity to commit crimes. Further, the government does not even advance a Rule 404(b) argument before us.

Instead, the government argues that the Rule 404(b)'s prohibition on evidence of bad character or criminal propensity does not apply here because Hale and Spittel's acts of avoidance before buying OTC and HBA from Johnson and O'Neal were "intrinsic" to the charged conspiracy. Two types of prior bad acts, both labeled "intrinsic," are excluded from the ambit of Rule 404(b). First, a defendant's prior bad acts other than the crime charged that are"inextricably intertwined" with the charged crime do not fall within the ambit of Rule 404(b). United States v. Chin, 83 F.3d 83, 88 (4th Cir. 1996). Other bad acts are "inextricably intertwined" with the crime charged when "both [the crime charged and the other bad acts] are part of a single criminal episode" or when "the other acts were necessary preliminaries to the crime charged." Id. The "inextricably intertwined" exception to Rule 404(b) keeps witnesses from having to testify on tiptoe. It allows them to mention a defendant's unrelated prior bad acts or crimes that

45

come up naturally as part of the story of the crime charged because the facts of the prior bad acts or crimes are inseparably woven with the facts of the crime charged. It also allows the prosecution to offer a "coherent and comprehensible story regarding the commission of the crime," which may include a discussion of a defendant's bad acts or crimes that necessarily precede a discussion of the crime charged. Without this exception a witness might be forced to redact his narrative and render it incoherent (thereby intolerably hindering the presentation of evidence), just to avoid mentioning acts for which the defendant is not being tried, even though they were part of the same transaction as, or set the stage for, the crime charged. See United States v. Vizcarra-Martinez, 66 F.3d 1006, 1012-13 (9th Cir. 1995). As a result of this exception, it is often said that evidence of a defendant's unrelated prior bad acts or crimes that are"necessary to complete the story of the crime" are admissible, even though this evidence was unnecessary, strictly speaking, to prove any element of the crime charged. See, e.g., United States v. Love, 134 F.3d 595, 603 (4th Cir.), cert. denied, 118 S. Ct. 2332 (1998); Chin, 83 F.3d at 88; United States v. Masters, 622 F.2d 83, 87 (4th Cir. 1980). However, this is a narrow exception, see United States v. Hill , 953 F.2d 452, 456 n.1 (9th Cir. 1991), which only allows admission of bad acts that form the basic factual setting of the crime or some other"integral part of the crime charged," United States v. Heidebur, 122 F.3d 577, 579 (8th Cir. 1997), as necessary to give "a coherent picture of the facts" of the crime charged, id. The exception is not a broad license to introduce gratuitous evidence about a defendant's prior bad acts that are unlinked in time and space to the crime charged under the guise of providing the jury with assorted "background information."

The second category of evidence that is excluded from the scope of Rule 404(b) is evidence of prior bad acts that are not unrelated to the crime charged, but rather are direct proof of the crime charged. See, e.g., United States v. Loayza, 107 F.3d 257, 263-64 (4th Cir. 1997); United States v. Dozie, 27 F.3d 95, 97 (4th Cir. 1994); United States v. Brewer, 1 F.3d 1430, 1436 (4th Cir. 1993); United States v. Dudley, 941 F.2d 260, 262-63 (4th Cir. 1991). This type of bad act evidence falls outside of the scope of Rule 404(b) because the acts at issue are, by definition, not extrinsic acts; they are part and parcel of the crime charged. Since Rule 404(b) excludes only evidence of prior bad acts that was admitted for no other purpose than to prove bad

46

character or criminal propensity, see Queen, 132 F.3d at 994, a defendant's prior bad acts that are introduced to prove an element of the crime charged are not be excluded just because they also tend to show that the defendant had bad moral character or a criminal propensity.[12]

b. Johnson and O'Neal's testimony fits neither definition of "intrinsic"

The government argues that the testimony of Johnson and O'Neal fits both definitions of "intrinsic." First, it says that Johnson and O'Neal's testimony helped tell the story of the crime because it "demonstrated how the relationships between various conspirators were formed and helped establish how the conspiracy operated." Appellee's Br. 63. Second, the government claims that Johnson and O'Neal's testimony was evidence of the crime itself because it "show-[ed] that Hale and Spittel . . . were willfully blind to the stolen nature of the goods [they] later purchased from Thomas . . . [and] fell within the conspiracy charged in the indictment . . . ." We reject both of these assertions.

In support of its first claim, the government reminds us that O'Neal and Johnson both joined Thomas's conspiracy to sell stolen OTC and HBA, which Hale and Spittel also allegedly joined. Both O'Neal and Johnson were charged as co-conspirators with Thomas before they pleaded guilty because both O'Neal and Johnson sold stolen OTC to Thomas at one time or another during the time frame of the charged conspiracy. However, just because Johnson, O'Neal, Hale, and Spittel were all charged as co-conspirators does not automatically render every interaction between any of these four during the time of the charged conspiracy either "inextricably intertwined" with or a "neces-

_____

[12] A common example of this second type of "intrinsic evidence" is testimony about a defendant's prior bad acts or crimes that were committed in furtherance of a charged conspiracy. Such evidence is not subject to the strictures of Rule 404(b) because it describes an overt act of the charged conspiracy (even if the act itself is not charged). See, e.g., United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994); United States v. Bailey, 990 F.2d 119, 122 (4th Cir. 1993); United States v. Mark, 943 F.2d 444, 448 (4th Cir. 1991); United States v. Rawle, 845 F.2d 1244, 1247 n.4 (4th Cir. 1988).

47

sary preliminary" to the story of the <u>charged</u> conspiracy. Johnson and O'Neal's testimony was about facts "inextricably intertwined" with the charged conspiracy only if the testimony was necessary for them to explain their interactions with Hale and Spittel as part of the government's proof of either the conspiracy or one or more of the substantive crimes charged in the indictment. That was not the case. Neither Johnson nor O'Neal testified about any of the defendants besides Hale and Spittel (and Cruse, who did business with Hale), so their testimony was not necessary to prove that any of the other defendants committed the crimes charged. Further, O'Neal and Johnson did not testify about Hale or Spittel's relationship with Thomas. They said nothing about any of the overt acts of the conspiracy committed by Hale or Spittel or about any of the substantive money laundering or receiving stolen property counts with which Hale and Spittel were charged. In fact, the only point of O'Neal and Johnson's testimony was that Hale and Spittel were deliberately ignorant during the transactions involving these four. As such, there is no possibility that Johnson or O'Neal's testimony was inextricably intertwined with the facts of the crime charged. Johnson and O'Neal's testimony "had nothing whatsoever to do with the factual setting" of the crime charged, <u>Heidebur</u>, 122 F.3d at 580, and was not "vital to an understanding of the context of the government's case against" the defendants or even "an integral and natural part of an account of the crime" that was "linked in time and circumstances with the charged crime," <u>United States v. McLean</u>, 138 F.3d 1398, 1403 (11th Cir.), <u>cert. denied</u>, 119 S. Ct. 221 (1998). The crime charged was conspiracy to buy OTC and HBA from (or sell OTC and HBA with) Thomas, and neither Johnson nor O'Neal said anything relevant about the defendants' participation in that conspiracy for which their testimony about Hale and Spittel was a necessary preliminary or with which it was inseparably woven.

Johnson and O'Neal's testimony about Hale and Spittel's willful blindness also was not part of the proof of the crime charged. The indictment made no mention of the sale of stolen goods between Hale and Spittel and fences besides Thomas. Indeed, the indictment was quite specific about how Thomas's conspiracy operated: Thomas bought OTC and HBA from fences, like O'Neal and Johnson, and then resold it to the defendants, including Hale and Spittel's company, North Bridge. J.A. 275-79. Johnson and O'Neal were only mentioned in the indictment for their own, separate dealings with Thomas. J.A.

48

272, 285. None of the alleged overt acts of the conspiracy involving Hale and Spittel, nor any of the substantive counts with which they were charged, related to Hale and Spittel's dealings with Johnson or O'Neal. J.A. 293-96. All of the overt acts and substantive counts in the indictment related to Hale and Spittel's direct dealings with Thomas (or his wife). Of course, it is not necessary for every "intrinsic" act mentioned at trial to be charged as an overt act in furtherance of the conspiracy. However, in order to be part of the proof of the crime charged, the purportedly intrinsic act must be an act in furtherance of the conspiracy. Cf. United States v. Garcia Abrego, 141 F.3d 142, 175 (5th Cir. 1998). Other bad acts by Hale and Spittel which were not in furtherance of the conspiracy are not admissible, even if they occurred during the time frame of the charged conspiracy.

In this case, we conclude that Hale and Spittel's actions testified to by O'Neal and Johnson were not part of the charged conspiracy, but rather were part of an unrelated conspiracy. It was uncontested at trial that Johnson and O'Neal dealt with Hale and Spittel at times when neither Johnson nor O'Neal were dealing with Thomas. In fact, when Johnson and O'Neal were selling to North Bridge, they were Thomas's competitors. Although the dealings between North Bridge and O'Neal and Johnson involved the same subject matter as Thomas's conspiracy, stolen OTC and HBA, there was no evidence tending to show that Johnson and O'Neal's dealings with North Bridge were part of Thomas's conspiracy. But plenty of evidence suggested otherwise. Johnson and O'Neal's sales to Hale and Spittel did not follow the specific pattern of the indictment, which alleged that the sale of stolen OTC and HBA from fences and boosters always passed through Thomas -- and only Thomas -- to the defendants. Also, unlike Curly Johnson, who was essentially a hired fence for Thomas, O'Neal and Toby Johnson were independent mercenary fences who sold to the highest bidder. Further, neither O'Neal nor Johnson sold to Thomas while North Bridge was part of Thomas's conspiracy, but rather before and after (respectively) Thomas sold to North Bridge. From this evidence it is clear that Johnson and O'Neal's activities with North Bridge were a side deal, entirely unrelated to their involvement in the Thomas conspiracy.

Because Johnson and O'Neal's testimony was neither "inextricably intertwined" with the story of the crime charged or proof of the crime

49

itself, the evidence was not admissible as "intrinsic" evidence. Without this direct evidence of Spittel and Hale's willful blindness, there was no direct evidentiary support for the district court's ostrich instruction.

\* \* \*

Having reviewed all the evidence, both direct and circumstantial, that the government offers in support of the district court's ostrich instruction, we find no support in the record for that instruction. The only question at trial was whether or not the defendants knew that Thomas sold stolen OTC and HBA. "The ostrich instruction did not advance this inquiry; it confused it, by pointing the jury to circumstances of deliberate avoidance of knowledge that did not exist." Giovannetti, 919 F.2d at 1228. Therefore, the giving of the ostrich instruction was error.

C. Prejudicial Impact of the Ostrich Instruction

The government further claims that the giving of the unsupported ostrich instruction was harmless error because the trial court "conditioned application of the instruction on a finding of proof beyond a reasonable doubt that the defendants kept themselves ignorant" that Thomas's OTC and HBA was stolen. Appellee Br. 97 (citing United States v. Stone, 9 F.3d 934, 937-42 (11th Cir. 1993)). Here the government apparently means to argue that we should follow Stone. See United States v. Whittington, 26 F.3d 456, 464 n.8 (4th Cir. 1994) (declining to reach issue of whether to follow Stone).

In Stone "[t]he evidence of [the defendant's] actual knowledge . . . was sufficient to support a guilty verdict but was not overwhelming," 9 F.3d at 937, and the jury was instructed (as it was here, J.A. 1844) that "a precondition to its application of the deliberate ignorance instruction was proof beyond a reasonable doubt that[the defendant] deliberately kept himself ignorant," id. at 938. Under these circumstances, the Stone court held that the giving of an unsupported ostrich instruction was harmless error.

Stone offered two bases for its holding. First, the court adopted the "fundamental . . . presumption that juries obey .. . `the instructions

50

given them by the trial judge.'" Id. at 938 (quoting Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983)). This presumption, Stone reasoned, necessarily rendered the error of giving the ostrich instruction harmless, because "[i]f . . . there was insufficient evidence of deliberate ignorance to prove that theory beyond a reasonable doubt, then the jury, following the instruction, as we must assume it did, did not convict on deliberate ignorance grounds." Id. at 938. Thus, Stone reasoned, "[b]ecause we presume that the jury followed its instructions, it follows that the jury disregarded the deliberate ignorance instruction and that the guilty verdict was based on the only remaining theory: [the defendants'] actual knowledge." Id. at 940.

The Stone court also opined that its holding was dictated by Griffin v. United States, 502 U.S. 46, 49 (1991). See Stone, 9 F.3d at 939, 938-41. In Griffin the Supreme Court held that when a defendant was convicted by general verdict of conspiracy and the evidence was legally sufficient to establish his guilt for one of the conspiracy's two charged objects, the Due Process Clause did not require reversal simply because the jury was instructed on both objects. See 502 U.S. at 47-48, 56-57. This holding was an attempt to harmonize the rule of Turner v. United States, 396 U.S. 398, 420 (1970) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."), with the rule of Yates v. United States, 354 U.S. 298, 312 (1957) ("[A] verdict [must] be set aside in cases where the [it] is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."), and Stromberg v. California, 283 U.S. 359, 361 (1931) (requiring reversal of general-verdict convictions that may have rested on an unconstitutional ground). See Griffin, 502 U.S. at 52-60. The Griffin court explained that these two rules apply in different circumstances: the rule of Yates and Stromberg, which requires reversal of a general verdict when there is some uncertainty that the verdict rested on the erroneous ground, applies only to legal errors, constitutional or otherwise, while the rule of Turner applies to factual errors. See id. at 58-59. And, for the purpose of this distinction, the Griffin court said, legal insufficiency is "factual" error, not"legal" or constitutional error. Id. at 59. According to the Stone court, "the lesson of Griffin is that due process is not violated when `a trial court instruct[s] a jury on two different legal theories, one supported by the evidence, the

51

other not.'" Stone, 9 F.3d at 939 (quoting Sochor v. Florida, 504 U.S. 527, 538 (1992)). Therefore, Stone held that when the evidence "was, as in Griffin, sufficient to support a conviction on one theory (actual knowledge) but insufficient to support a conviction on the other theory (deliberate ignorance) . . . we can assume that jurors will reject the `factually inadequate theory,' and convict based on alternative grounds for which the evidence was sufficient." 9 F.3d at 939 (quoting Griffin, 502 U.S. at 59) (omission in the original, some internal quotations omitted).

At least two other circuits have adopted Stone 's rule that an unsupported ostrich instruction is harmless error per se. See United States v. Mari, 47 F.3d 782, 785-87 (6th Cir. 1995) (following Stone); United States v. Adeniji, 31 F.3d 58, 63-64 (2d Cir. 1994) (following Stone, but also concluding that the evidence of actual knowledge was overwhelming); cf. also United States v. Scott , 37 F.3d 1564, 1578 (10th Cir. 1994) (holding that it was harmless error when the court's general ostrich instruction was supported only for some of the defendants and citing Stone). However, four circuits have expressed the view that the giving of an unsupported ostrich instruction can be reversible error even if there was sufficient evidence to support the conviction on an alternative basis. See, e.g. , United States v. Covington, 133 F.3d 639, 645 (8th Cir. 1998); United States v. Aguilar, 80 F.3d 329, 333 (9th Cir. 1996); United States v. Hilliard, 31 F.3d 1509, 1517 (10th Cir. 1994); United States v. Barnhart, 979 F.2d 647, 652-53 n.1 (8th Cir. 1992); United States v. Mapelli, 971 F.2d 284, 285-87 (9th Cir. 1992); United States v. Ojebode, 957 F.2d 1218, 1228-29 (5th Cir. 1992); United States v. Sanchez-Robles, 927 F.2d 1070, 1075-76 (9th Cir. 1991); United States v. de Francisco-Lopez, 939 F.2d 1405, 1412-13 (10th Cir. 1991).

1. Three defendants: ostrich instruction was harmless error

The split in authority over Stone is more apparent than real. The persuasive value of the cases holding that an unsupported ostrich instruction can be prejudicial error is limited, since most of these opinions predate Stone, and none of the more recent decisions discuss Stone, much less refute it. Further, if we assume (as Stone counsels) that a jury follows its instructions, there is no worry that a jury will be led to convict a defendant based on negligence or recklessness just

52

because the ostrich instruction was unwarranted, since the standard ostrich instruction expressly prohibits the jury from doing this. Cf. Stone, 9 F.3d at 940. We therefore apply Stone and hold that an unsupported ostrich instruction is harmless error when the jury is instructed (as it was here) that a precondition to its application is proof beyond a reasonable doubt of deliberate ignorance.

The government presented ample evidence that Ebert, Kazinec, and Eidelman actually knew that Thomas sold stolen OTC and HBA.[13] All of this evidence came from testimony of the government's witness, Donald Thomas. This evidence was sufficient for a reasonable jury to find these defendants guilty.

First, Thomas testified that both Ebert and Kazinec knew about his illegal operations. According to Thomas, in June 1994 Ebert traveled to North Carolina to visit D&C Imports and inspect Thomas's cleanup operation. J.A. 926, 1258, 2156-57. Thomas described how Ebert took a particular interest in ensuring that all security sensors were removed from the merchandise. JA 927. During this visit, Ebert asked Thomas how many "boosters" worked for him; Thomas refused to say. J.A. 926-29. Thomas testified that Kazinec asked him the very same question when Thomas and an associate were delivering a shipment of OTC and HBA to M&I in New York. J.A. 921. Kazinec also suggested to Thomas that he take his vacations in the summertime "because people can't wear the big coats to get the merchandise out." J.A. 922. In addition, when Kazinec and Ebert refused to pay Thomas for a shipment of goods, Kazinec mockingly asked what Thomas was "going to do; call the police?" J.A. 935.

Second, Thomas's testimony revealed that although Eidelman worked for a legitimate wholesaler, American Drug, Eidelman knew that the merchandise American Drug bought from Thomas was stolen.

_____

[13] Thomas also testified that York was an insider in the stolen property ring. He explained that one night, while York was helping him and his family clean OTC and HBA in his basement, he received a telephone call warning him that he was going to be raided by the police. York and other members of Thomas's operation immediately loaded the merchandise into various vehicles and took it to York's house in Grover, North Carolina. JA 819, 891-94, 896.

53

When Hale took Thomas to American Drug in Beltsville, Thomas initially refused to deal with the company. Thomas saw some merchandise at American Drug that he thought he recognized from a recent undercover investigation by the Raleigh police. Fearing a setup, Thomas would not sell his stolen OTC and HBA to American Drug until Gilat reassured him that the police were not involved. J.A. 944-45. Eidelman was present when Gilat reassured Thomas, and Eidelman even lent his own reassurance (as paraphrased by Thomas) that "[American Drug] had done business with Steve Hale so long that he knew that [Hale] wouldn't do anything to hurt them with the police or anything." J.A. 945. Eidelman also told Thomas, when giving him a tour of American Drug, that all of American Drug's invoices were on the computer "and if any of the police or anybody ever came in on them, that they had something there that [the secretary] could push and it erased [the invoices]." J.A. 946.

From this evidence, the jury could conclude that Ebert, Kazinec, and Eidelman knew Thomas was selling stolen OTC and HBA. We therefore find the unsupported ostrich instruction to be harmless error as to these three defendants.

2. Seven defendants: no evidence of actual knowledge

For the remaining seven defendants who filed timely appeals, Stone by its own terms does not apply. The key assumption underlying Stone is that the jury was presented with two grounds for its decision, actual knowledge and deliberate ignorance, and there was sufficient evidence to support a jury verdict on the former theory but not on the latter. See Stone, 9 F.3d at 938-399. That is not the case for seven defendants.

Our review of the trial record has not unearthed, and the government does not point to, sufficient evidence from which a rational jury could find that Jay Phillips, Johnny Foster, Wayne Foster, Best Deal, Bill Cruse, Steve Hale, and Bob Spittel had actual knowledge that Thomas was selling stolen OTC and HBA. There was, without question, no direct evidence that any of these seven defendants knew the real source of Thomas's goods. Of all the government's witnesses in this case, none could say that these seven defendants knew that the OTC and HBA Thomas sold was stolen. Thomas, the kingpin of the

54

stolen OTC and HBA ring, who was on the witness stand for eight days, never testified that he told any of these defendants that he was selling stolen property. In fact, Thomas testified that told several of these defendants, including Steve Hale, he was not selling them stolen OTC and HBA. J.A. 1161, 1070. Thomas also admitted that he was highly secretive about the sources of his OTC and HBA. No member of Thomas's stolen property operation testified that any of these seven defendants knew Thomas's OTC and HBA was stolen, either. Moreover, the government offers no circumstantial proof from which the jury could have inferred that these defendants knew Thomas's OTC and HBA was stolen. None of the defendants ever saw any of Thomas's dealings with his boosters, and although some defendants (Hale, Spittel, the Fosters, and Phillips) saw Thomas buy OTC and HBA from his fences, nothing about these transactions indicated that the OTC and HBA was stolen, not salvaged. Further, there was no indication that any of these seven defendants knew that Thomas's OTC and HBA operation was not a legitimate salvaged goods operation. As we have explained at length, there was nothing suspicious about Thomas's operation. See supra part III.B.1. Although Thomas did not operate his business in a formal or structured way (for example, he often transacted business in cash, he delivered his merchandise in parking lots, and he sold at flea markets), this is not a crime. And there is nothing in the record to indicate that these seven defendants viewed his business as a criminal operation, rather than a legitimate business.

The government argues, however, that some testimony of Joseph Parisi, a wholesaler in New York who bought OTC and HBA from North Bridge and other defendants, was direct evidence that Steve Hale knew Thomas sold stolen OTC and HBA. Parisi testified that he had a conversation with Hale regarding stolen OTC and HBA -- not obtained from Thomas -- that North Bridge sold to him, in which Hale said that he (Parisi) could not possibly be so"naive" as to not "know where the stuff was coming from." J.A. 1448. (Parisi testified that he did not answer Hale because he knew that the goods in question were stolen. J.A. 1448.)

However, we conclude that Parisi's testimony about Hale was improperly admitted for the same reason that O'Neal and Toby Johnson's testimony about Hale and Spittel was improperly admitted. See supra part III.B.2. Although Parisi's testimony may have been admis-

55

sible under Fed. R. Evid. 404(b) to prove Hale knew Thomas sold stolen OTC and HBA, we need not decide this. The government made no effort to admit the evidence under Rule 404(b), and the district court gave no limiting instruction telling the jury that the evidence was admissible solely for the purpose of showing Hale's knowledge, Rec. Vol. 27, at 142, 145-46; J.A. 1842-43. Thus, like O'Neal and Johnson's testimony, Parisi's testimony was admitted as substantive evidence of the charged conspiracy between Thomas and the defendants.

Yet there was no evidence that Parisi joined in the charged conspiracy. Parisi was in New York, he did not work for any of the defendants' companies, and he was not part of Thomas's booster network. He was not indicted along with the other defendants or even mentioned in any of the indictments. Indeed, there was very little evidence at trial about Parisi, other than his own testimony and evidence that OTC and HBA he bought from various defendants had been stolen. And, there was no evidence that Parisi knew that any of these defendants, except Hale, sold him stolen OTC and HBA. Since the government did not prove that Parisi was part of the charged conspiracy, his testimony about his prior dealings with Hale was neither evidence of the charged conspiracy nor inextricably intertwined with the charged conspiracy. See supra part III.B.2.

Since there was no properly admitted evidence that Phillips, Johnny Foster, Wayne Foster, Best Deal, Hale, or Spittel actually knew that the OTC and HBA they bought from Thomas, or that Cruse knew that the OTC and HBA he helped Thomas sell was stolen, the government did not prove the intent element for any of the crimes charged. Therefore, submitting the case against them to the jury on a willful blindness theory was reversible error.

IV. VENUE: MONEY LAUNDERING AND RECEIVING STOLEN PROPERTY CHARGES AGAINST EBERT

North Carolina was an improper venue to prosecute Ebert for money laundering and receiving stolen property. We must therefore

vacate his convictions on those counts and remand for dismissal for improper venue.**14**

The Eastern District of North Carolina was an improper venue to prosecute this defendant for money laundering because the offense charged was allegedly committed entirely in New York and Maryland. See United States v. Cabrales, 118 S. Ct. 1772, 1775, 1776-77 (1998) (rejecting the holding of United States v. Heaps, 39 F.3d 479, 482 (4th Cir. 1994), that a money laundering offense is a "continuing offense" under 18 U.S.C. § 3237(a), which may be prosecuted in either the district where the charged financial transaction occurred or the district where the predicate act of generating funds occurred). We also conclude that venue in North Carolina was improper on the charge of receiving stolen property. Although we previously held that receipt of stolen property is a continuing offense under § 3237(a), prosecutable in either the district where the charged receipt of property occurred or the district where the predicate act of stealing that property occurred, see United States v. Melia , 741 F.2d 70, 72 (4th Cir. 1984), we must reconsider our prior holding in light of Cabrales. Cabrales counsels that the crime of receiving stolen property, like the crime of money laundering, is not a continuing offense and therefore may not be prosecuted in the district where the predicate act occurred. However, venue in North Carolina was proper on the conspiracy charge based on the overt acts of a coconspirator there. See Cabrales, 118 S. Ct. at 1776-77.

We therefore vacate Ebert's money laundering and receiving stolen property convictions. We remand for dismissal of these charges for improper venue and for his resentencing.

V. CONCLUSION

For these foregoing reasons, we reverse the convictions of, and remand for entry of judgment of acquittal for, Best Deal, Jay Phillips, Johnny Foster, Wayne Foster, Steve Hale, Bob Spittel, and Bill Cruse. We affirm the conspiracy convictions of Isaac Ebert, Mike Kazinec, and Mark Eidelman. We also affirm the convictions of Kazinec and

_____

**14** Although Kazinec and Eidelman were also convicted on those charges, only Ebert raised this point on appeal.

Eidelman for money laundering and receiving stolen property but vacate Ebert's convictions on these charges. We remand for dismissal of the money laundering and receiving stolen property charges against Ebert and for his resentencing.[15]

AFFIRMED IN PART, REVERSED IN
PART, VACATED IN PART, AND
REMANDED WITH INSTRUCTIONS

NIEMEYER, Circuit Judge, dissenting:

This appeal involves 11 defendants and some 30 issues. The transactions involved are numerous and different for each defendant. They occurred at different times and at different places. The evidence showed, for instance, that transactions involving North Bridge Salvage in Terrell, North Carolina (involving defendants Hale and Spittel) occurred during the period from late 1993 to early 1994, whereas transactions involving American International Wholesale Drug in Beltsville, Maryland (involving defendant Eidelman) occurred during the period from July 1994 to September 1994. The relationship between many defendants was thin or nonexistent, and it is not altogether clear from the record that the transactions between Thomas, at the core of this conspiracy, and the defendants were of the same nature and involved the same conspiracy.

Even when the facts are laid out by the parties in their briefs, their attribution to any given defendant is nearly impossible to keep straight and therefore to understand. It would surely have been a yet more difficult task for the jury to have kept these matters straight for each of the defendants during the course of trial.

Most of the assignments of error arose from the confusion that existed with respect to the differing liabilities of the various defen-

_____

[15] We grant the government's motion to submit the supplemental brief that it tendered before oral argument. The government has also moved to strike the June 15, 1998, letter to the clerk from defense counsel that enclosed a Wall Street Journal article about a gray market in retail goods. Because we have not considered the letter or article, the government's motion to strike is denied as moot.

dants. While the majority has undertaken the courageous effort of attempting to assign proven facts to individual defendants, I cannot be sure that it has been fair to the government in this effort, particularly when the government is entitled to have all of the inferences drawn in its favor.

For these reasons, I am not prepared, on this record, to acquit any defendants as the majority has done with respect to several. Rather, I would order new trials, directing the district court to determine whether this case could be broken down into perhaps three separate cases, thereby limiting the government's proof to evidence with respect to fewer defendants in each case. It may very well turn out following this kind of endeavor that the jury would find the evidence as to some of the defendants insufficient. But as the record stands, I am not satisfied that we can be sufficiently sure of such a conclusion.

Because I would vacate the judgments and remand this case, I respectfully dissent.